**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

CATO INSTITUTE,

      Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION
AND UNITED STATES DEPARTMENT OF
JUSTICE,

      Defendants.

Civil Action No. 20-3338-JEB

## DEFENDANTS' STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

Statement of Facts ...................................................................................................... 1

   I.   The Request ...................................................................................... 1

   II.   FBI Records, the Search, and the Production .............................................. 3

   III.   This Litigation .................................................................................. 5

Legal Standard .......................................................................................................... 5

Argument .................................................................................................................. 7

   I.   The FBI's Search and Withholdings Were Reasonable ..................................... 7

    A.   The FBI's Search Was Reasonable. ........................................................ 7

    B.   The FBI's Withholdings Were Proper. .................................................... 9

     1.   Exemption 3: Information Protected by Statute ................................... 10

     2.   Exemptions 6 and 7(C): Unwarranted Invasion of Personal Privacy ........... 11

     3.   Exemption 7(E): Investigative Techniques and Procedures ..................... 16

   II.   The FBI's *Glomar* Response Regarding Certain Intelligence Records Was Appropriate .20

Conclusion ............................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

\*Adionser v. DOJ,
  811 F. Supp. 2d 284 (D.D.C. 2011); aff'd, Case No. No. 11-5093,
  2012 WL 5897172 (D.C. Cir. Nov. 5, 2012) ........................................................... 19

Amuso v. DOJ,
  600 F. Supp. 2d 78 (D.D.C. 2009) ........................................................... 18

\*Blackwell v. FBI,
  646 F.3d 37 (D.C. Cir. 2011) ........................................................... 13, 16

Brayton v. Off. of the U.S. Trade Representative,
  641 F.3d 521 (D.C. Cir. 2011) ........................................................... 5

\*Campbell v. DOJ,
  164 F.3d 20 (D.C. Cir. 1998) ........................................................... 7, 8

Carter v. U.S. Dep't of Com.,
  830 F.2d 388 ........................................................... 11

\*CIA v. Sims,
  471 U.S. 159 (1985) ........................................................... 10

Comput. Prof'ls v. U.S. Secret Serv.,
  72 F.3d 897 (D.C. Cir. 1996) ........................................................... 12

Ctr. for Nat. Sec. Stud. v. DOJ,
  331 F.3d 918 (D.C. Cir. 2003) ........................................................... 6

Dep't of Air Force v. Rose,
  425 U.S. 352 (1976) ........................................................... 11

Diamond v. Atwood,
  43 F.3d 1538 (D.C. Cir. 1995) ........................................................... 5

\*Dillon v. DOJ,
  102 F. Supp. 3d 272 (D.D.C. 2015) ........................................................... 14, 15

DOD v. FLRA,
  510 U.S. 487 (1994) ........................................................... 11

DOJ v. Reps. Comm. for Freedom of the Press,
  489 U.S. 749 (1989) ........................................................... 11, 12, 14

*Elec. Priv. Info. Ctr. v. NSA,
  678 F.3d 926 (D.C. Cir. 2012) ............................................................. 6, 20

Favish,
  541 U.S. 157 (2004) ............................................................................. 12

*Fischer v. DOJ,
  596 F. Supp. 2d 34 (D.D.C. 2009) ......................................................... 17

Fitzgibbon v. CIA,
  911 F.2d 755 (D.C. Cir. 1990) ............................................................... 10

Gardels v. CIA,
  689 F.2d 1100 (D.C. Cir. 1982) ............................................................... 6

Goland v. CIA,
  607 F.2d 339 (D.C. Cir. 1978) ................................................................. 9

Ground Saucer Watch, Inc. v. CIA,
  692 F.2d 770 (D.C. Cir. 1981) ................................................................. 6

Halpern v. FBI,
  181 F.3d 279 (2d Cir. 1999) .................................................................... 8

Hodge v. FBI,
  703 F.3d 575 (D.C. Cir. 2013) ............................................................... 10

*James Madison Project v. CIA,
  344 F. Supp. 3d 380 (D.D.C. 2018) ........................................................ 22

Jud. Watch v. DOJ,
  365 F.3d 1108 (D.C. Cir. 2004) ............................................................. 12

Kowalcyzk v. DOJ,
  73 F.3d 386 (D.C. Cir. 1996) ................................................................... 8

Larson v. Dep't of State,
  565 F.3d 857 (D.C. Cir. 2009) ............................................................... 20

Martin v. DOJ,
  488 F.3d 446 (D.C. Cir. 2007) ............................................................... 13

Mayer Brown LLP v. IRS,
  562 F.3d 1190 (D.C. Cir. 2009) ............................................................. 16

Mays v. DEA,
  234 F.3d 1324 (D.C. Cir. 2000) ............................................................. 12

*Mobley v. CIA,
  806 F.3d 568 (D.C. Cir. 2015) ........................................................................ 8, 9

*Murphy v. Exec. Off. for U.S. Att'ys,
  789 F.3d 204 (D.C. Cir. 2015) ............................................................................ 10

Nat'l Cable Television Ass'n, Inc. v. FCC,
  479 F.2d 183 (D.C. Cir. 1973) ......................................................................... 6, 11

Oglesby v. U.S. Dep't of the Army,
  920 F.2d 57 (D.C. Cir. 1990) .................................................................................. 7

*Ortiz v. DOJ,
  67 F. Supp. 3d 109 (D.D.C. 2014) ........................................................................ 19

Painting & Drywall Work Pres. Fund, Inc. v. HUD,
  936 F.2d 1300 (D.C. Cir. 1991) ........................................................................... 11

Perry v. Block,
  684 F.2d 121 (D.C. Cir. 1982) ............................................................................... 5

*PETA v. NIH,
  745 F.3d 535 (D.C. Cir. 2014) ............................................................................. 20

Pub. Empl. for Env'tl. Resp. v. Int'l Boundary Water Comm'n,
  740 F.3d 195 (D.C. Cir. 2014) ............................................................................. 16

Reed v. NLRB,
  927 F.2d 1249 (D.C. Cir. 1991) ........................................................................... 11

SafeCard Servs., Inc. v. SEC,
  926 F.2d 1197 (D.C. Cir. 1991) ............................................................................. 6

Schrecker v. DOJ,
  349 F.3d 657 (D.C. Cir. 2003) ............................................................................... 6

*Shapiro v. DOJ,
  Civil Action No. 12-cv-313 (BAH), 2020 WL 3615511 (D.D.C. July 2, 2020) ...... 18

U.S. Dep't of State v. Wash. Post Co.,
  456 U.S. 595 (1982) ............................................................................................. 11

Weisberg v. DOJ,
  705 F.2d 1344 (D.C. Cir. 1983) ............................................................................. 7

Wolf v. CIA,
  473 F.3d 370 (D.C. Cir. 2007) ............................................................................. 20

**Statutes**

*5 U.S.C. § 552 ............................................................................................................. *passim*

50 U.S.C. § 3024 .................................................................................................... 10, 21

Pub. L. No. 95-78,
   91 Stat. 319 (1977) ............................................................................................... 10

**Regulations**

*Classified National Security Information*,
   75 Fed. Reg. 707 (Dec. 29, 2009). ........................................................................ 21

**Rules**

Fed. R. Civ. P. 56 .......................................................................................................... 5

**Other Authorities**

U.S. Gov't Accountability Off., GAO-22-105845,
   Freedom of Information Act: Selected Agencies Adapted to COVID-19
   Challenges but Actions Needed to Reduce Backlogs (Mar. 29, 2022)........................ 2

Defendants Federal Bureau of Investigation (FBI) and the U.S. Department of Justice move for summary judgment in this Freedom of Information Act (FOIA) case because they have fulfilled their duties under that statute. A policy analyst for Plaintiff Cato Institute requested that the FBI search for six terms, all related to the Cato Institute. The FBI did exactly that, searching for those terms in its central database. With an eye toward maximum disclosure, the FBI withheld limited pieces of information, such as the identities of third parties who reported potential crimes, because they implicated privacy and law enforcement interests that FOIA protects. And because the request was for documents related to a specific organization, the FBI provided a standard *Glomar* response, refusing to confirm or deny the existence of any additional records that may have been compiled while carrying out national security investigations or foreign intelligence gathering. This decision is also permitted under FOIA because even acknowledging the existence of such records would disclose exempt information, namely information protected by Executive Order 13,526 and the National Security Act of 1947.

To satisfy its summary judgment burden, the FBI has provided the accompanying declaration of Record/Information Dissemination Section Chief Michael G. Seidel, which provides a full description of the search, the withholdings, and the decision not to acknowledge the existence of certain intelligence records. For the reasons stated in that declaration and the following, Defendants are entitled to summary judgment.

## STATEMENT OF FACTS

### I.    The Request

The origin of this case is a FOIA request that Patrick G. Eddington, a policy analyst for Plaintiff, submitted on December 11, 2019. *See* FOIA Request, Seidel Decl. Ex. A. Unlike a request for documents reflecting a certain subject matter, Eddington's request was for specific search terms: "Cato," "Cato Institute," "The Cato Institute," "Cato Benefactor," "Cato employee,"

and "Cato contractor." *Id.* Eddington also requested that certain other search terms, including "Wikileaks," "Immigration," and "Encryption," "be utilized, in a separate search, in combination with the search terms above." *Id.* In addition to asking for specific search terms to be used, Eddington asked "that the FBI search any cross-reference files or electronic surveillance (ELSUR) files for responsive records, and to query FBI field offices for potentially responsive documents, including those deemed automatically declassified per the FBI Automatic Declassification Manual issued on May 2007." *Id.* And, Eddington asked that the search "include, but not be limited to, the FBI Guardian database or any related or successor systems." *Id.*

The FBI acknowledged receipt Eddington's request on January 13, 2020, stating, among other things, that it had assigned a request number and that the request for expediting processing was denied. Letter from David Hardy, Section Chief, Record/Information Dissemination Section, Information Management Division, FBI, to Patrick G. Eddington, Cato Institute, Seidel Decl. Ex. B. Because the FBI, like many parts of the government, receives a large volume of FOIA requests and faces many challenges responding to such a volume, it often takes months to respond to complex requests. This is particularly true because of the disruption caused by the pandemic. *See* Seidel Decl. ¶ 3 n.1 (identifying staffing shortages that has affected the FBI's FOIA program); *see also generally* U.S. Gov't Accountability Off., GAO-22-105845, Freedom of Information Act: Selected Agencies Adapted to COVID-19 Challenges but Actions Needed to Reduce Backlogs (Mar. 29, 2022). Because "RIDS was experiencing fluctuating staffing shortages despite a continued high volume of incoming requests and litigation" in the months following Eddington's request, it took some time to respond. Seidel Decl. ¶ 3 n.1. After Eddington followed up on his request on November 4, 2020, *id.* ¶ 7; Email from Patrick G. Eddington, Research Fellow, Cato Institute, to Public Information Officer, FBI (Nov. 4, 2020), ECF No. 1-3, the FBI responded the

next day, explaining the likely delay, and suggested that Eddington request an updated estimated date of completion once the FBI completed its search, Seidel Decl. ¶ 8; Email from Public Information Officer, FBI, to Patrick G. Eddington, Research Fellow, Cato Institute (Nov. 5, 2020), ECF No. 1-3.

## II.    FBI Records, the Search, and the Production

The FBI maintains a Central Records System (CRS), "an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency." Seidel Decl. ¶ 12. The system "spans the entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and FBI legal attaché offices ("legats") worldwide." *Id.* The CRS is organized by indices, which are the "'key' to locating records within the enormous amount of information contained in the CRS." *Id.* ¶ 14. These indices are organized "in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties." *Id.* "Indexing information in the CRS is done at the discretion of FBI investigators when information is deemed of sufficient significance to warrant indexing for future retrieval." *Id.* ¶ 15.

Historically, indices were manually logged on index cards. *Id.* ¶ 22. Beginning in 1995, they were logged electronically, first through a program called Automated Case Support and then through the current program, Sentinel. *Id.* ¶¶ 16–19. With each update, the FBI merged most existing indices into the new electronic platform. *Id.* ¶¶ 23–24.

In addition to the CRS, the FBI maintains a system of ELSUR, which is also organized by indices. *Id.* ¶ 26. Those "indices include records of (a) targeted individuals and entities of electronic surveillance pursuant to court order, consensual monitoring, or other authority; (b)

owners, lessors, or licensors of the premises where the FBI conducted electronic surveillance; (c) and individuals identified as participants of monitored and recorded communications." *Id.* These indices were also historically logged on index cards and later merged and logged on the current electronic program, Sentinel. *Id.* ¶¶ 27–28 & n.9. "As a result, the names of monitored subjects by FBIHQ or FBI Field Offices since January 1, 1960, are also now CRS records that are indexed within, and searchable by, the index functions employed within Sentinel to locate CRS records." *Id.* ¶ 28; *see also id.* ("ELSUR information is indexed within the CRS and can be located and retrieved via index searches of the automated indices search functions available in Sentinel").

Based on Eddington's request, which involved an organization and individuals, the FBI determined that the CRS would house any responsive records. *Id.* ¶ 29. Accordingly, the FBI applied Plaintiffs' requested search terms in Sentinel. *Id.* ¶ 32.

On June 30, 2021, the FBI notified Eddington that it had completed its search and had identified 166 responsive pages, 78 of which it would release. Letter from Michael G. Seidel, Section Chief, Record/Information Dissemination Section, FBI, to Patrick Eddington, Seidel Decl. Ex. C [hereinafter Production Letter]; Seidel Decl. ¶ 10. It stated that certain information was withheld pursuant to FOIA Exemptions (b)(3), (b)(6), (b)(7)(C), and (b)(7)(E). *Id.* It also provided a standard response that "to the extent [Eddington's] request seeks records of intelligence sources, methods, or activities, the FBI can neither confirm nor deny the existence of records pursuant to FOIA exemptions (b)(1) [and] (b)(3)." Production Letter; *see also* Seidel Decl. ¶ 74. This response is provided for requests that "may implicate classified and/or unclassified intelligence records where the existence or non-existence of the records would cause cognizable harm protected under FOIA." Seidel Decl. ¶ 72. Specifically, "[t]he FBI invokes the Exemption 1 and 3 *Glomar* response to protect any records the FBI may or may not have compiled while carrying out its responsibilities

to investigate threats to national security and gather foreign intelligence." Such records "include, but are not limited to, unacknowledged national security investigations and assessments pertaining to cases such as terrorism and counterintelligence; files containing sensitive methods such as electronic surveillance targeting subjects of national security interest; specific national security related intelligence programs, events, methods, or techniques; joint intelligence community ("IC") assessments concerning threats to national security of the United States." *Id.* ¶ 74.[1]

### III.    This Litigation

Plaintiff filed its Complaint on November 17, 2020. ECF No. 1. The Complaint contains two counts: (I) that the FBI has not produced records responsive to Plaintiff's request and (II) that the FBI has not conducted a reasonable search. *Id.* ¶¶ 16–23.

Since the Complaint was filed, the parties have filed a number of joint status reports updating the Court on the FBI's production and Plaintiff's review of that production. After failing to agree on the sufficiency of the FBI's production, the parties jointly proposed a summary judgment briefing schedule, which the Court granted on March 17, 2022.

### LEGAL STANDARD

"[T]he vast majority of FOIA cases can be resolved on summary judgment." *Brayton v. Off. of the U.S. Trade Representative*, 641 F.3d 521, 527 (D.C. Cir. 2011). As with non-FOIA cases, summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). Courts review agencies' responses to FOIA requests de novo. 5 U.S.C. § 552(a)(4)(B).

---

[1] "Due to the sensitivity and potentially classified nature of this information, should the Court request additional information the FBI can submit a classified *in camera* declaration for further consideration." Seidel Decl. ¶ 74.

"[I]n adjudicating the adequacy of the agency's identification and retrieval efforts, the trial court may be warranted in relying upon agency affidavits, for these 'are equally trustworthy when they aver that all documents have been produced or are unidentifiable as when they aver that identified documents are exempt.'" *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982) (quoting *Nat'l Cable Television Association, Inc. v. FCC*, 479 F.2d 183, 186 (D.C.Cir.1973)). Similarly, "[i]n *Glomar* cases, courts may grant summary judgment on the basis of agency affidavits that contain 'reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" *Elec. Priv. Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1105 (D.C. Cir. 1982)). The agency is entitled to "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981)). Because the process of conducting a reasonable search requires "both systemic and case-specific exercises of discretion and administrative judgment and expertise," this "is hardly an area in which the courts should attempt to micro manage the executive branch." *Schrecker v. DOJ*, 349 F.3d 657, 662 (D.C. Cir. 2003) (quoting *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C.Cir.2002)). This is particularly so when it comes to matters of national security: the D.C. Circuit has "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review. *Ctr. for Nat. Sec. Stud. v. DOJ*, 331 F.3d 918, 927 (D.C. Cir. 2003).

**ARGUMENT**

The FBI is entitled to summary judgment for two reasons. With respect to the portion of the request for which documents were produced and withheld, the search was reasonable and the withholdings were proper. And with respect to the remainder of the request, the FBI cannot confirm or deny its possession of responsive records because doing so would jeopardize its national security and foreign intelligence gathering activities.

## I.    The FBI's Search and Withholdings Were Reasonable.

With respect to the portion of the request for which documents were produced and withheld, summary judgment is appropriate if conditions are met. First, "the agency must show beyond material doubt is that it has conducted a search reasonably calculated to uncover all relevant documents." *Weisberg v. DOJ*, 705 F.2d 1344, 1351 (D.C. Cir. 1983). Second, materials that are withheld must fall within a FOIA statutory exemption. *Id.* Section Chief Seidel's declaration demonstrates that the FBI reasonably searched for, produced, and withheld documents in response to Eddington's request.

### A.    The FBI's Search Was Reasonable.

The FBI's search for the terms included in the request was eminently reasonable. To demonstrate the adequacy of a search, an agency need only "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Campbell v. DOJ*, 164 F.3d 20, 27 (D.C. Cir. 1998) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). "Reasonableness," not perfection, is the guiding principle in determining the adequacy of a FOIA search. *See id.*

In terms of scope, the FBI reasonably determined that responsive records would be found only in the CRS. *See* Seidel Decl. ¶ 29. The CRS "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and

maintained by the FBI in the course of fulfilling its missions and functions as a law enforcement, counterterrorism, and intelligence agency" and "spans the entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and . . . legats . . . worldwide." *Id.* ¶ 12. Furthermore, the CRS is organized by indices, which allows the FBI to search for specific terms, such as those that Eddington requested. *Id.* ¶¶ 14–15. In light of "the comprehensive nature of the information contained in the CRS"—particularly the ability to search for Eddington's requested search terms—"the FBI determined the CRS is the FBI system where records responsive to this request would reasonably be found using the index search methodology." *Id.* ¶ 29.

The FBI accordingly "conducted a CRS index search for potentially responsive records employing the Sentinel and ACS indices available through Sentinel, as well as the manual indices of FBIHQ, FBI field offices and FBI's legats by entering [Eddington's requested] search terms." *Id.* ¶ 32. The result of that search was zero main entries (i.e., the subject or focus of an investigation) and a number of reference entries (i.e., individuals or non-individuals . . . associated with an investigation, but who or which are not the main subject or focus of the investigation). *Id.*

Courts have routinely upheld the FBI's search of the CRS in response to a general request for information about a particular subject. *See, e.g.*, *Mobley v. CIA*, 806 F.3d 568, 581–82 (D.C. Cir. 2015); *Campbell*, 164 F.3d at 27. Key to these holdings is the fact that "the CRS houses 'all information which [the FBI] acquire[s] in the course of fulfilling its mandated law enforcement responsibilities.'" *Mobley*, 806 F.3d at 581. Eddington submitted a general request for certain search terms, and the FBI searched its central database for those terms. Because there is nothing unreasonable about that approach, the Court should deem the search adequate.

Eddington did request that the FBI "query FBI field offices for potentially responsive documents" as well as search "the FBI Guardian database or any related or successor systems."

*See* FOIA Request. But "a request for an agency to search a particular record system—without more—does not invariably constitute a 'lead' that an agency must pursue." *Mobley*, 806 F.3d at 582. Rather, the requester must provide a lead that is "both clear and certain" and "so apparent that the FBI cannot in good faith fail to pursue it." *See id.* (quoting *Kowalcyzk v. Dep't of Just.*, 73 F.3d 386, 389 (D.C. Cir. 1996)) (observing, for example, that "the FBI could not decline to search beyond the CRS where records in the CRS themselves indicated that there were undiscovered responsive records located in other record systems" (quoting *Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999))). Eddington's lead is anything but clear and certain—he simply asked to search certain locations without explaining why responsive records would be found there and not in the CRS. Indeed, the FBI explained that "there is no basis . . . to conclude that a search elsewhere would reasonably be expected to locate responsive material not able to be located via an index search of the CRS" and that such a search would therefore "be unduly burdensome in nature, duplicative, and unlikely to yield results not found via the CRS index search." Seidel Decl. ¶ 33. Under Plaintiff's "approach, which would allow a requester to dictate, through search instructions, the scope of an agency's search, the reasonableness test for search adequacy long adhered to in [the D.C.] circuit would be undermined." *Mobley*, 806 F.3d at 582. The court should therefore deem the FBI's search reasonable.

     **B.**    **The FBI's Withholdings Were Proper.**

Of course, the FBI need not produce everything that it finds. It is also entitled to withhold information protected by FOIA. The FBI's withholdings in this case were proper because they concern information protected by statute, would constitute an unwarranted invasion of personal privacy, or would reveal investigative techniques and procedures. Each exemption that the FBI invoked is discussed in turn below.

### 1.   Exemption 3: Information Protected by Statute

FOIA "does not apply to matters that are . . . specifically exempted from disclosure by statute . . . if that statute . . . (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). This exemption "differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for [the] decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. CIA*, 607 F.2d 339, 350–51 (D.C. Cir. 1978). Consequently, under Exemption 3, judicial review is limited to whether (1) the withholding statute qualifies as an Exemption 3 statute, and (2) the withheld material satisfies the criteria of the exemption statute. *See CIA v. Sims*, 471 U.S. 159, 167 (1985); *Fitzgibbon v. CIA*, 911 F.2d 755, 761 (D.C. Cir. 1990).

The FBI properly withheld five pages pursuant to Exemption 3 because they were protected by Rule 6(e) of the Federal Rules of Criminal Procedure and the National Security Act of 1947.

Rule 6(e), which directs that "an attorney for the government" and certain government personnel "must not disclose a matter occurring before the grand jury," is considered a statute "because the Congress has enacted it into positive law." *Murphy v. Exec. Off. for U.S. Att'ys*, 789 F.3d 204, 206 (D.C. Cir. 2015) (citing Pub. L. No. 95-78, § 2(a), 91 Stat. 319 (1977)). Accordingly, "information related to a grand jury matter may be withheld under exemption 3 'if the disclosed material would tend to reveal some secret aspect of the grand jury's investigation, including the identities of witnesses.'" *Id.* (quoting *Hodge v. FBI*, 703 F.3d 575, 580 (D.C.Cir.2013)). That is undoubtedly the case with the three pages that the FBI withheld because of Rule 6(e): they contain "the name of the recipient of the federal grand jury subpoena and information that identifies

specific records subpoenaed by a federal grand jury, both of which are undisclosed." Seidel Decl. ¶ 39.

The National Security Act of 1947 requires that the Director of National Intelligence, and by extension each component of the intelligence community, to "protect intelligence sources and methods from authorized disclosure." *See* 50 U.S.C. § 3024(i)(1). The "wide-ranging authority" provided by this statute indicates that "Congress simply and pointedly protected all sources of intelligence that provide, or are engaged to provide, information the [agency] needs" to gather and analyze intelligence. *CIA v. Sims*, 471 U.S. 159, 169–70, 177 (1985). Accordingly, it is also recognized as a withholding statute under Exemption 3. *Id.* Because "the FBI has determined that intelligence sources and methods would be revealed if any of the withheld file numbers on Bates pages FBI(20-cv-3338)-74 and FBI(20-cv-3338)-75 are disclosed to Plaintiffs," Seidel Decl. ¶ 69, those two pages are also properly withheld under Exemption 3.

## 2.    Exemptions 6 and 7(C): Unwarranted Invasion of Personal Privacy

Exemption 6 shields information about individuals in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). For this exemption to apply, the information at issue must be maintained in a government file and "appl[y] to a particular individual." *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 602 (1982). Once this threshold is met, Exemption 6 requires the agency to balance the individual's right to privacy against the public interest in disclosure. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

The privacy interests protected by Exemption 6 are construed broadly because disclosure under FOIA is tantamount to disclosure to the public at large. *See DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 763 (1989); *Painting & Drywall Work Pres. Fund, Inc. v.*

*HUD*, 936 F.2d 1300, 1302 (D.C. Cir. 1991). By contrast, the public interest in disclosure of information is construed narrowly; the "only relevant 'public interest in disclosure' to be weighed in this balance is the extent to which disclosure would serve the 'core purpose of the FOIA,' which is contribut[ing] significantly to public understanding *of the operations or activities of the government.*" *DOD v. FLRA*, 510 U.S. 487, 495 (1994) (quoting *Reps. Comm.*, 489 U.S. at 775). The requester bears the burden of demonstrating that the release of the withheld information would serve this interest. *See Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 391–92 & nn.8 & 13 (D.C. Cir. 1987).

The balancing of privacy interests versus disclosure is similar under Exemption 7(C), which protects from disclosure "records or information compiled for law enforcement purposes" to the extent that the disclosure of the records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). In fact, "the privacy inquiry of Exemptions 6 and 7(C) [is] essentially the same," although Exemption 7(C) requires a lower showing to justify the withholding. *Jud. Watch v. DOJ*, 365 F.3d 1108, 1125 (D.C. Cir. 2004). The additional privacy protection is embodied in the broader language used in the text of Exemption 7(C). *See Reps. Comm.*, 489 U.S. at 756; *see also Nat'l Archive & Recs. Admin. v. Favish*, 541 U.S. 157, 165–66 (2004). By affording this additional protection, Exemption 7(C) recognizes the "strong interest" that "suspects, witnesses, or investigators" have in not being publicly associated with law enforcement files. *Mays v. DEA*, 234 F.3d 1324, 1327 (D.C. Cir. 2000) (quoting *Comput. Prof'ls v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996)).

As set forth in the Section Chief Seidel's declaration, the FBI properly withheld certain pieces of information based on these privacy exemptions. These withholdings can be divided into four categories of names and identifying information: (1) third parties who provided information;

(2) special agents and professional staff; (3) third parties merely mentioned; and (4) third parties of investigative interest. *See* Seidel Decl. Ex. D.

    *First*, the FBI properly withheld the names and other identifying information concerning third parties who provided information to the FBI. *See* Seidel Decl. ¶¶ 48, 56. As Section Chief Seidel explains, disclosure of these third parties, who are "merely victims providing information to the FBI about potentially criminal acts, . . . carries an extremely negative connotation": these individuals could be subjected to "harassment, intimidation by investigative subjects, legal or economic detriment, physical harm, or death." *Id.* ¶¶ 48–49; *see also id.* ¶ 56 (describing victims who provided information "in support of an FBI criminal investigation into aggravated extortion and overt threats" where the "Cato Institute is merely referenced as the location at which the third party received the threat"). What is more, "[t]he largest obstacle to successfully obtaining such information critical to FBI investigations, through an interview or otherwise, is fear by the individual providing the information that his or her identity will be exposed." *Id.* ¶ 49. For these reasons, the FBI assures those who provide information that their identities "will be held in the strictest confidence." *Id.* Plaintiff has not provided a privacy waiver from the third parties authorizing release of their information or proof of death. *Id.* ¶¶ 48, 56. Accordingly, the FBI determined that these third parties have substantial privacy interests in not having information about them found in records the FBI disclosed publicly. *Id.* ¶¶ 49, 56.

    The FBI balanced these privacy interests against the lack of public interest in the disclosure of the information. Disclosure of these names and information would "not shed light on or significantly increase the public's understanding of the operations and activities of the FBI." *Id.* ¶ 50; *see also id.* ¶ 56. And "continued access by the FBI to persons willing to honestly provide pertinent facts bearing on a particular investigation far outweighs any benefit the public might

13

derive from disclosure of the identities of those who cooperate with the FBI." *Id.* ¶ 50; *see also id.* ¶ 56. Accordingly, the FBI concluded that the disclosure of this information would constitute a clearly unwarranted invasion of their personal privacy.

This determination was proper: Plaintiff can identify no public interest that would overcome the FBI's decision not to disclose this identifying information. This is all the more true because "privacy interests are particularly difficult to overcome when law enforcement information regarding third parties is implicated." *Blackwell v. FBI*, 646 F.3d 37, 41 (D.C. Cir. 2011) (quoting *Martin v. DOJ*, 488 F.3d 446, 457 (D.C. Cir. 2007)) (Kavanaugh, J.). Under these circumstances, courts routinely affirm the government's decision not to disclose the identities of third parties. *See, e.g.*, *Dillon v. DOJ*, 102 F. Supp. 3d 272, 295–96 (D.D.C. 2015) (collecting cases). There is no reason to depart from that line of cases here.

*Second*, the FBI properly withheld the names and identifying information concerning special agents and professional staff. These individuals "were responsible for conducting, supervising, and maintaining investigative and administrative activities related to the FBI's investigation of potential crimes in which the Cato Institute or its employees were victims, or investigations of potential crimes alleged to have been committed by Cato Institute employees." Seidel Decl. ¶ 51. The FBI determined that withholding the names of these individuals was necessary to protect those investigations: both special agents and professional staff "could be targeted for reprisal based on their involvement in a specific investigation." *Id.* ¶ 53; *see also id.* ¶ 51. Furthermore, they "were, and still are, in positions of access to information regarding official law enforcement investigations, and therefore could become targets of inquiries for unauthorized access to investigations if their identities are released." *Id.* ¶ 53; *see also id.* ¶ 51. On the other side of the ledger, the FBI reasoned that "there is no public interest served by disclosing [special agent]

14

identities because their identities would not, themselves, significantly increase the public's understanding of the FBI's operations and activities." *Id.* ¶ 53; *see also id.* ¶ 51 (stating the same for professional staff).

Once again, because disclosing the identities of these individuals would not "shed[] light on an agency's performance of its statutory duties," the FBI's withholdings should be deemed proper. *See Reps. Comm.*, 489 U.S. at 773. Courts in this district have routinely permitted the FBI to withhold the names of agents and support personnel under these circumstances, *see Dillon*, 102 F. Supp. 3d at 295–96 (collecting cases), and Plaintiff cannot explain why this case should be treated any differently.

*Third*, the FBI properly withheld the names and identifying information concerning third parties who were merely mentioned in investigative records. These individuals come up only because they are "tangentially mentioned in conjunction with the FBI's investigative efforts in the investigation of potential crimes in which the Cato Institute or its employees were victims, or investigations of potential crimes alleged to have been committed by Cato Institute employees." Seidel Decl. ¶ 54. They are "not of investigative interest to the FBI." *Id.* The FBI determined that it could not disclose these individuals' identities without compromising their privacy: "Considering that the FBI is an investigative and intelligence agency, disclosure of these third parties' names or other identifying information in connection with FBI records carries an extremely negative connotation. Disclosure of their identities would possibly subject these individuals to harassment or criticism and focus derogatory inferences and suspicion on them." *Id.* The FBI also reasoned that "any public interest that would override the privacy interest and concluded that disclosing information about individuals merely mentioned in an FBI investigative

file would not shed light on or significantly increase the public's understanding of the operations and activities of the FBI." *Id.*

Courts in this district routinely affirm withholdings of "third parties incidentally mentioned in FBI records" when the plaintiff cannot identify a public interest in disclosure. *Dillon*, 102 F. Supp. 3d at 295–96. Because Plaintiff cannot identify such a public interest, this Court should affirm the FBI's withholdings here.

*Fourth*, the FBI properly withheld the names and identifying information concerning third parties of investigative interest. As with other third parties, these individuals have a strong privacy interest in not having their identities disclosed: "Being identified as a subject of FBI investigative interest carries a strong negative connotation and a stigma, regardless of whether these individuals ever committed a crime. Release of the identities of these individuals to the public could subject them to harassment or embarrassment, as well as undue public attention. Furthermore, it could result in professional and social repercussions, due to the resulting negative stigma." *Id.* ¶ 55. And, on the other side of the ledger, "disclosing personal information about these individuals would not shed light on or significantly increase the public's understanding of the FBI's operations and activities." *Id.*

Courts in this district routinely affirm withholdings of "third parties of investigative interest" when the plaintiff cannot identify a public interest in disclosure. *Dillon*, 102 F. Supp. 3d at 295–96. Because Plaintiff cannot identify such a public interest, this Court should affirm the FBI's withholdings here.

### 3.   Exemption 7(E): Investigative Techniques and Procedures

Finally, the FBI properly withheld an internal FBI telephone number, sensitive investigative file numbers, and the identity of a sensitive investigative database under Exemption 7(E). Exemption 7(E) protects records or information that "would disclose techniques and

procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'" *Pub. Empl. for Env't Resp. v. Int'l Boundary Water Comm'n*, 740 F.3d 195, 205 (D.C. Cir. 2014) (quoting *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011)). "To clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk "that a law will be violated or that past violators will escape legal consequences." *Id.* (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C.Cir.2009)).

*First*, the withholding of an internal telephone number was proper. The FBI determined that disclosure "would provide criminals with specific targets for attacks on FBI communications" and, "[c]onsidering the current cyber-security environment where government data breaches on government systems are prevalent, . . . could provide criminals with an avenue to exploit the FBI's Information Technology system." Seidel Decl. ¶ 59. In addition, "a criminal could use the FBI telephone number in a spoofing attempt by disguising their number as the FBI telephone number and representing themselves as FBI employees to gain access to secure information." *Id.* A criminal "could then use this information to gain unauthorized access to FBI systems and/or hinder the FBI's ability to enforce the law by manipulating information or disrupting the FBI's internal communications." *Id.* For these reasons, "[r]eleasing this information poses substantial risks to FBI information systems, could potentially decrease the FBI's effectiveness, and could enable criminals to circumvent the law." *Id.* Courts routinely permit the FBI to withhold internal telephone numbers, *see, e.g.*, *Fischer v. DOJ*, 596 F. Supp. 2d 34, 45–46 (D.D.C. 2009) ("Clearly,

these telephone numbers relate solely to the FBI's internal practices and are of no genuine public interest."), and there is no reason to conclude differently here.

*Second*, the withholding of sensitive investigative file numbers was proper. These file numbers concern "the investigation of the FBI's investigation of potential crimes in which the Cato Institute or its employees were victims, or investigations of potential crimes alleged to have been committed by Cato Institute employees." Seidel Decl. ¶ 60. Disclosing the withheld portions of the file number would reveal a number of pieces of information that could be used to uncover FBI investigative techniques and procedures. For example, the number indicates "the type of investigative or intelligence gathering program to which the investigation pertains," which would reveal "key non-public information about the investigation" and "critical information about non-public investigative techniques and procedures, and provide criminals and foreign adversaries with the ability to discern the types of highly sensitive investigative strategies." *Id.* ¶ 61. The number also indicates the field office that initiated the investigation, which would reveal "critical information about where and how the FBI detected particular criminal behavior or national security threats" as well as "key pieces about the FBI's non-public investigations or intelligence or evidence gathering sources and methods." *Id.* ¶ 62. And, the number indicates the subject matter under investigation, which would "provide criminals and foreign adversaries with a tracking mechanism by which they can place particular files, and thus, investigations, within the context of larger FBI investigative efforts." *Id.* ¶ 63. Courts in this district have upheld such withholdings because "'as more information is identified with the particular file,' the plaintiff or others could begin to construct a 'mosaic' leading ultimately to 'exposure of actual intelligence activities or methods.'" *Shapiro v. DOJ*, Civil Action No. 12-cv-313 (BAH), 2020 WL 3615511, at *24 (D.D.C. July 2, 2020) (quoting an FBI declaration), *appeal filed*, No. 20-5318, 2020 WL 5970640

(D.C. Cir. Oct. 7, 2020); *cf.*, *Amuso v. DOJ*, 600 F. Supp. 2d 78, 91–92 (D.D.C. 2009) (holding

that Exemption 2 permitted FBI to withhold informant file numbers because disclosure "'would

have a chilling effect on the activities and cooperation of other FBI confidential informants' whose

cooperation is enlisted 'only with the understanding of complete confidentiality'" (quoting an FBI

declaration)). This Court should similarly permit the FBI to withhold sensitive investigative file

numbers.

*Third*, the FBI properly withheld the identity of a sensitive investigative database. As the

FBI explained, disclosure "would give criminals insight into the available tools and resources the

FBI uses to conduct criminal and national security investigations." Seidel Decl. ¶ 65. It would also

reveal the nature of the database's utility to investigators: "different investigative databases contain

varying datasets and revealing the types of data sought by investigators in particular investigative

circumstances would reveal the FBI strategies employed in different investigative circumstances."

*Id.* ¶ 66. Furthermore, disclosure "could jeopardize the FBI's investigative function by revealing

exactly where the FBI stores and from where it obtains valuable investigative data." *Id.* ¶ 67. For

example, "[k]nowing the database name makes the original source data an attractive target for

compromise and provides criminals who gain access to FBI systems with an idea of where to

discover what the FBI knows and how it gathered the information, and possible information

regarding the FBI's investigative strategies." *Id.* And "disclosure would provide criminals with the

opportunity to corrupt or otherwise destroy information stored within this database." *Id.*

Withholding the identity of a sensitive investigative database is routinely upheld in this district.

*See, e.g.*, *Ortiz v. DOJ*, 67 F. Supp. 3d 109, 123–24 (D.D.C. 2014); *Adionser v. DOJ*, 811 F. Supp.

2d 284, 300 (D.D.C. 2011) (holding that the "FBI properly applied . . . exemption [7(E)] to protect

law enforcement techniques and procedures that relate to the identification and contents of the FBI

databases"), *aff'd*, No. 11-5093, 2012 WL 5897172 (D.C. Cir. Nov. 5, 2012). There being no difference between these cases, this Court should permit the FBI to withhold the identity of a sensitive investigative database.

⁎⁎

As Section Chief Seidel's declaration explains, the FBI conducted a reasonable search in response to Eddington's request and was justified in the limited withholdings that it made. Summary judgment is therefore appropriate with respect to Counts I and II of the Complaint.

## II.    The FBI's *Glomar* Response Regarding Certain Intelligence Records Was Appropriate.

Notwithstanding the FBI's search for responsive records, the FBI justifiably refused to confirm or deny the existence of any additional records related to its national security and foreign intelligence gathering functions. "In certain cases, merely acknowledging the existence of responsive records would itself 'cause harm cognizable under [a] FOIA exception.'" *PETA v. NIH*, 745 F.3d 535, 540 (D.C. Cir. 2014) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (additional citation omitted)). "In that event, an agency can issue a *Glomar* response, refusing to confirm or deny its possession of responsive records," and is entitled to summary judgment if it can "demonstrate that acknowledging the mere existence of responsive records would disclose exempt information." *Elec. Priv. Info. Ctr.*, 678 F.3d at 931. In doing so, the agency's explanatory burden is not demanding. "Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'" *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)). If a *Glomar* response is appropriate, "the agency need not conduct any search for responsive documents or perform any analysis to identify segregable portions of such documents." *PETA*, 745 F.3d at 540.

Several FOIA exemptions can support a *Glomar* response. Any request for records concerning an individual or organization can turn up responsive records that "the FBI may or may not have compiled while carrying out its responsibilities to investigate threats to national security and gather foreign intelligence." Seidel Decl. ¶ 74. And acknowledging otherwise "unacknowledged national security investigations and assessments pertaining to cases such as terrorism and counterintelligence; files containing sensitive methods such as electronic surveillance targeting subjects of national security interest; specific national security related intelligence programs, events, methods, or techniques; joint intelligence community ("IC") assessments concerning threats to national security of the United States" would jeopardize these responsibilities. *Id.*

Therefore, when a requester seeks records about a particular individual or organization, the FBI issues a standard *Glomar* response under Exemption 1, which protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order," 5 U.S.C. § 552(b)(1), and Exemption 3, which, as discussed above, protects information "specifically exempted from disclosure by statute . . . if that statute . . . (A)(i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and (B) if enacted after the date of enactment of the Open FOIA Act of 2009, specifically cites to this paragraph," *Id.* § 552(b)(3).

Because Eddington requested records concerning the Cato Institute, an organization, the FBI issued this standard response.

With respect to Exemption 1, the FBI based its *Glomar* response on Executive Order 13,526, which authorizes the FBI to "refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors." *Classified National Security Information*, 75 Fed. Reg. 707, 719 (Dec. 29, 2009). Among other things, such acknowledgment "could confirm or refute the FBI's reliance on a particular intelligence source, method, or activity, which could, in turn, reveal non-public information regarding the nature of the FBI's intelligence interests, priorities, sources, activities, and methods—information that is desired by hostile actors who seek to thwart the FBI's intelligence-gathering function." Seidel Decl. ¶ 82. The FBI therefore concluded that "to confirm or deny that the FBI possesses records responsive to Eddington's request related to the FBI's intelligence gathering duties risks compromising intelligence activities and methods, including sources, and thus poses at least a serious risk to the national security of the United States." *Id.* ¶ 82.

And with respect to Exemption 3, the FBI bases its *Glomar* response on the National Security Act of 1947, which provides that the Director of National Intelligence "shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 3024(i)(1). The DNI has in turn directed the FBI to "protect 'national intelligence and intelligence sources, methods and activities from unauthorized disclosure.'" Seidel Decl. ¶ 85. The FBI "determined that such intelligence sources and methods could be disclosed if the FBI acknowledges the existence or non-existence of national security-related or foreign intelligence-related records responsive to Eddington's FOIPA request." *Id.* ¶ 86. Similar to the justification for its response under Exemption 1, acknowledging the existence of intelligence gathering activities with respect to an individual or organization could itself undermine such activities: such acknowledgment "provides adversaries with valuable insight into who and where the FBI is directing investigative efforts," which would

allow them "to devise more effective counter-surveillance techniques to shield their current activities from detection." *Id.* The FBI also reasoned that acknowledgment would "permit hostile governments to appraise the scope, focus, location and capabilities of FBI's intelligence gathering methods and activities and allow hostile agents to devise countermeasures to circumvent these intelligence activities or methods and render them useless of providing intelligence information." *Id.* Altogether, this could "cause damage to the national security as it would (a) reveal the actual intelligence activity or method utilized by the FBI against a specific target; (b) disclose the intelligence-gathering capabilities or the method and (c) provide an assessment of the intelligence source penetration of a specific target during a specific period of time." *Id.* The FBI therefore concluded that "to the extent Eddington's request seeks records of intelligence sources, methods, or activities, the National Security Act, in conjunction with Exemption 3, provides an additional and independent basis for the FBI's *Glomar* response to neither confirm nor deny the existence or non-existence of any such records when providing its response to Eddington's request." *Id.*

The FBI has more than carried its burden to justify its *Glomar* response here. It has identified reasons why acknowledging the existence of certain intelligence sources, methods, or activities would compromise its role as an intelligence gathering agency, *see id.* ¶ 70, which triggers both Exemption 1 and 3. Courts routinely uphold an agency's *Glomar* response under these circumstances. *See, e.g.*, *James Madison Project v. CIA*, 344 F. Supp. 3d 380, 388–89 (D.D.C. 2018). And Plaintiff cannot identify basis to overcome the strong presumption that the FBI is owed.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment.

Dated: June 3, 2022                          Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General
                                             Civil Division

                                             ELIZABETH J. SHAPIRO
                                             Deputy Branch Director
                                             Civil Division, Federal Programs Branch

                                             *Benjamin Takemoto*
                                             BENJAMIN T. TAKEMOTO
                                             (DC Bar # 1045253)
                                             Trial Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box No. 883, Ben Franklin Station
                                             Washington, DC 20044
                                             Phone: (202) 532-4252
                                             Fax: (202) 616-8460
                                             E-mail: benjamin.takemoto@usdoj.gov

                                             *Attorneys for Defendants*