IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CATO INSTITUTE,<br><br>  Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION and UNITED STATES DEPARTMENT OF JUSTICE,<br><br>  Defendants. | Civil Action No. 20-3338-JEB |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I. The FBI's Search Was Reasonable. .................................................................................... 1

    A. All Responsive Records Are Likely to Be Found in the CRS. ..................................... 1

    B. The FBI's Decision Not to Search the eGuardian and Guardian Systems Was Reasonable Because Information in Those Systems Is Either Located in the CRS or Does Not Qualify as an Agency Record. ....................................................................................... 5

        1. The Guardian Program .......................................................................................... 6

        2. The Guardian System ............................................................................................ 6

        3. The eGuardian System .......................................................................................... 6

    C. The FBI's Decision Not to Additionally Search Emails at Field Offices Was Reasonable Because It Would Have Been Redundant. .......................................................... 9

II. Withholding the Database Printouts Was Proper under Exemptions 6 and 7(C). ............ 11

III. Conclusion ........................................................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. CIA*,
   710 F.3d 422 (D.C. Cir. 2013) .................................................................................................. 13

*\*Campbell v. DOJ*,
   164 F.3d 20 (D.C. Cir. 1998) ........................................................................................ 1, 2, 4, 5

*Carter v. U.S. Dep't of,*
   *Com.*, 830 F.2d 388 ................................................................................................................. 13

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ................................................................................................................. 11

*\*Dillon v. DOJ*,
   102 F. Supp. 3d 272 (D.D.C. 2015) ..................................................................................... 5, 12

*\*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) .................................................................................................. 7

*Kowalczyk v. DOJ*,
   73 F.3d 386 (D.C. Cir. 1996) ................................................................................................. 2, 3

*\*Mobley v. CIA*,
   806 F.3d 568 (D.C. Cir. 2015) ........................................................................................ *passim*

*Oglesby v. U.S. Dep't of the Army*,
   920 F.2d 57 (D.C. Cir. 1990) .................................................................................................... 2

*Performance Coal Co. v. DOL*,
   847 F. Supp. 2d 6 (D.D.C. 2012) ............................................................................................. 11

*Prop. of the People, Inc. v. DOJ*,
   405 F. Supp. 3d 99 (D.D.C. 2019) ........................................................................................... 10

*Reed v. NLRB*,
   927 F.2d 1249 (D.C. Cir. 1991) ............................................................................................... 11

*Reporters Comm. for Freedom of Press v. FBI*,
   877 F.3d 399 (D.C. Cir. 2017) ................................................................................................. 10

*Span v. DOJ*,
   696 F. Supp. 2d 113 (D.D.C. 2010) ........................................................................................... 5

*\*Tax Analysts v. DOJ*,
   845 F.2d 1060 (D.C. Cir. 1988) ................................................................................................. 7

**Statutes**

*5 U.S.C. § 552(b)(6) ................................................................................................................... 11

*5 U.S.C. § 552(b)(7) ................................................................................................................... 11

**Other Authorities**

2013 Privacy Impact Assessment for the eGuardian System,
   https://www.fbi.gov/services/information-management/foipa/privacy-impact-
   assessments/eguardian-threat#ided6d ........................................................................................ 8

Suspicious Incident Tracking System,
   https://oig.justice.gov/reports/FBI/a0902/final.pdf .................................................................... 9

At this stage of the case, only two issues remain: (1) whether the FBI's search was reasonable; and (2) whether the FBI's decision to withhold identifying information of third parties in certain database printouts pursuant to FOIA Exemptions 6 and 7(C) was appropriate. The FBI has now provided two declarations, which explain at length the reasonableness of its search and how it produced as much non-exempt material as it could. For these reasons, the Court should grant Defendants' Motion for Summary Judgment, ECF No. 26, and deny Plaintiff's Cross-Motion for Summary Judgment, ECF No. 27.

## I. The FBI's Search Was Reasonable.

Plaintiff's theory on the reasonableness of the search boils down to three points: first, that the Central Records System (CRS) and manual indices are not the only locations likely to contain responsive records, Pl.'s Mem. in Supp. of Cross Mot. for Summ. J. 4–11, ECF No. 28 [hereinafter Pl.'s Mem.]; second, that the FBI should have conducted an additional search of the Guardian and eGuardian systems, *id.* at 11–15; and third, that the FBI should have conducted an additional email search at twelve field offices, *id.* at 15–18.

### A. All Responsive Records Are Likely to Be Found in the CRS.

Plaintiff first argues that the FBI's search was unreasonable because, in its view, the FBI has not established that the CRS and manual indices are likely to contain all responsive records. *See* Pl.'s Mem. 4–11. However, the second declaration should erase any of Plaintiff's doubts: "the CRS is the FBI system where all records responsive to Plaintiff's request would reasonably be found." 2d Seidel Decl. ¶ 5, attached hereto. Plaintiff has offered no leads to suggest otherwise, nor has the FBI found one. *Id.*

Once again, to satisfy its summary judgment burden, the FBI need only "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Campbell v. DOJ*, 164 F.3d 20, 27

1

(D.C. Cir. 1998) (quoting *Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)). Part of this showing includes a "reasonably detailed affidavit . . . averring that all files likely to contain responsive materials (if such records exist) were searched." *Oglesby*, 920 F.2d at 68.

When it comes to searches involving the CRS, the D.C. Circuit has established certain guideposts to determine reasonableness: "When a request does not specify the locations in which an agency should search, the agency has discretion to confine its inquiry to a central filing system if additional searches are unlikely to produce any marginal return; in other words, the agency generally need not 'search every record system.'" *Campbell*, 164 F.3d at 28 (quoting *Oglesby*, 920 F.2d at 68). In exercising its discretion to conduct a standard search, of course the agency "must revise its assessment of what is 'reasonable' in a particular case to account for leads that emerge during its inquiry." *Id.* That said, "a request for an agency to search a particular record system— without more—does not invariably constitute a 'lead' that an agency must pursue." *Mobley v. CIA*, 806 F.3d 568, 582 (D.C. Cir. 2015). Rather, "[a] 'lead' must be 'both clear and certain' and 'so apparent that the [FBI] cannot in good faith fail to pursue it.'" *Id.* (quoting *Kowalczyk v. DOJ*, 73 F.3d 386, 389 (D.C. Cir. 1996)).

Thus, whereas "the FBI could not decline to search beyond the CRS where records in the CRS themselves indicated that there were undiscovered responsive records located in other record systems," a requester's mere "demand that the FBI search certain record systems" need not be followed. *Id.* (citation omitted). In sum, "[a]lthough an agency may not ignore a request to search specific record systems when a request reaches the agency before it has completed its search, a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records." *Id.*

2

The FBI has produced declarations that satisfy its summary judgment burden under these guideposts. Section Chief of the Record/Information Dissemination Section Michael G. Seidel has stated that "the CRS is the FBI system where *all* records responsive to Plaintiff's request would reasonably be found." 2d Seidel Decl. ¶ 5 (emphasis added). This is so because the information that the requester sought (i.e., search terms related to Cato) "would reasonably be expected to be in the CRS and located via the index search methodology," which houses "information about individuals, organizations, and other subjects of investigative interest for future retrieval." *Id.* The D.C. Circuit has held this type of search to be reasonable in these circumstances. *See Mobley*, 806 F.3d at 581 (holding that a search was reasonable when the declarant described the comprehensiveness of the CRS and explained that certain other databases were not searched because they were either "captured by the CRS or are unlikely to contain responsive records").

Section Chief Seidel additionally stated, "there is no indication from the information located as a result of the CRS index search that responsive material would reside in any other FBI system." 1st Seidel Decl. ¶ 33; 2d Seidel Decl. ¶ 5. Plaintiff argues that this statement "misunderstands Defendants' burden and is internally inconsistent" because the FBI "must establish that [it] searched all files likely to contain responsive records, whether or not Plaintiff or CRS search results provided them with bases to make that assertion." Pl.'s Mem. 6–7. But Plaintiff incorrectly assumes that Section Chief Seidel's statement is the basis for the FBI's conclusion that the CRS is the only database likely to contain responsive records. In fact, and as discussed above, the FBI reached that conclusion because of the CRS's "comprehensive nature and scope." 2d Seidel Decl. ¶ 5. *In addition*, Section Chief Seidel states, the results of the CRS search did not disabuse the FBI of that conclusion. *See id.* That additional statement makes abundantly clear that there is no reason to believe that there are other locations likely to contain responsive records.

3

Furthermore, Plaintiff is incorrect that an agency must search all locations likely to contain responsive records in all circumstances. In fact, the D.C. Circuit has held an FBI search to be reasonable when the FBI declined to search systems that "are redundant of records stored in the CRS." *See Mobley*, 806 F.3d at 581.

Section Chief Seidel additionally observed that "searches of any other locations would be unduly burdensome in nature, duplicative, and unlikely to yield results not found via the CRS index search." 1st Seidel Decl. ¶ 33. Plaintiff claims that this statement is "conclusory" and "misunderstands Defendants' requirements of proof," demanding that the FBI "establish that unsearched files are not likely to contain responsive material." Pl.'s Mem. 7. But once again, Section Chief Seidel's statement is taken out of context. In that paragraph and elsewhere in the declaration, Section Chief Seidel explains why all responsive records are likely to be located in the CRS. He also reasons that there were no leads to other databases, other than the manual indices of certain field offices, which were searched, *see* 1st Seidel Decl. ¶ 25. It follows from those two observations that searching systems that are already contained in the CRS, like Guardian or emails from unspecified employees at various field offices, *see* 2d Seidel Decl. ¶¶ 12–14, would be unduly burdensome, duplicative, and unlikely to yield results.

Finally, Plaintiff's reliance on *Campbell* for the proposition that the FBI needs to search beyond the CRS, *see* Pl.'s Mem. 8–9, because, unlike here, *Campbell* involved a concrete lead. *See Campbell*, 164 F.3d at 28.[1] As the *Mobley* panel later put it, "in *Campbell*, the court held that the FBI could not decline to search beyond the CRS where records in the CRS themselves indicated that there were undiscovered records located in other record systems." 806 F.3d at 582. This case

---

[1] Since *Campbell* was decided, ELSUR indices, one of the locations ordered to be searched, have been automated and are now located in the CRS. *See* 1st Seidel Decl. ¶ 28

4

is more analogous to *Mobley*, in which the requester's "demand that the FBI search certain record systems is generally mere fiat." *Id.* As explained in Section Chief Seidel's declarations and *infra*, there is no evidence that responsive records exist outside of the CRS.[2] Plaintiff also focuses on "the FBI's position in *Campbell* . . . that 'it need not conduct such searches [outside of the CRS] unless expressly asked to do so in a FOIA request.'" Pl.'s Mem. 9 (quoting *Campbell*, 164 F.3d at 27). Plaintiff then assumes, based on that statement, that as long as a requestor asks for a search outside of the CRS, the FBI would honor such a request. *See id.* In fact, such a request is just one *sufficient* condition to search outside of the CRS. Plaintiff must also come forward with a "clear and certain" lead that responsive records are located outside the CRS. *See Mobley*, 806 F.3d at 582. Because Plaintiff has not done so, there is no basis for the FBI to search outside the CRS.

> **B.    The FBI's Decision Not to Search the eGuardian and Guardian Systems Was Reasonable Because Information in Those Systems Is Either Located in the CRS or Does Not Qualify as an Agency Record.**

Plaintiff next argues that the FBI unreasonably failed to pursue a lead to the eGuardian and Guardian systems. *See* Pl.'s Mem. 11–15. Plaintiff claims that these systems "contain unique responsive records," and, therefore, that the FBI should have searched them. *See id.* at 13. Plaintiff is incorrect about Guardian—information in that system is included in the CRS. And Plaintiff is only partially correct about eGuardian. There is indeed some information in eGuardian that is not in the CRS. But that information is neither created nor controlled by the FBI, so it is not an agency

---

[2] Defendants apologize for mistakenly including *Campbell* in a string cite of the opening brief stating that courts routinely uphold CRS searches. Although that statement remains true, *see, e.g.*, *Mobley*, 806 F.3d at 581–82; *Dillon v. DOJ*, 102 F. Supp. 3d 272, 284–86 (D.D.C. 2015) (holding that the FBI's decision not to search email systems or field offices when it had already searched the CRS was reasonable); *Span v. DOJ*, 696 F. Supp. 2d 113, 120 (D.D.C. 2010) (holding that the FBI's decision not to search its I-drive, which contains preliminary work product investigative documents, when it had already searched the CRS was reasonable), for the above reasons, *Campbell* is not one such case.

5

record subject to FOIA. Furthermore, any eGuardian information that is used and controlled by the FBI is already captured in the FBI's CRS search.

### 1. The Guardian Program

As background, the FBI manages the Guardian Program, which allows "for reporting, sharing, tracking, and mitigating a large volume of counterterrorism-based incidents." 2d Seidel Decl. ¶ 6. The program is divided into two systems: eGuardian, a database that the FBI's law enforcement partners use to submit terrorism related information and through which the FBI shares terrorism related information, *Id.* ¶ 7, and Guardian, an FBI-controlled "classified automated system that records, tracks and shares suspicious activities and threat-related information with law enforcement and other government agency partners via information sharing platforms including information uploaded from e-Guardian," *id.* ¶ 10.

### 2. The Guardian System

Once again, all information in Guardian is uploaded into the CRS. *See* 2d Seidel Decl. ¶ 11 ("All Guardian incidents (FD-71a) are serialized in Sentinel."); *see also id.* ¶ 12. Plaintiff is therefore incorrect that Guardian contains unique responsive records, so the FBI's decision not to conduct a duplicative, additional search was reasonable. *See Mobley*, 806 F.3d at 581.

### 3. The eGuardian System

That leaves eGuardian. As a threshold matter, the request did not seek eGuardian records. Rather, it stated that the FBI's "search should include, but not be limited to, the FBI *Guardian* database or any related or successor systems." FOIA Request, 1st Seidel Decl. Ex. A (emphasis added). It did not mention the eGuardian database, which serves a purpose distinct from the Guardian database and contains records that are not generated by the FBI. *See* 2d Seidel Decl. ¶¶ 7–9.

6

Even assuming that the request for systems "related" to the Guardian database includes the eGuardian system, the FBI's decision not to conduct an additional search of eGuardian was also reasonable. The records in eGuardian that the FBI actually uses are already included in the CRS. For example, information that the FBI shares with its law enforcement partners that participate in eGuardian is serialized. *See* 2d Seidel Decl. ¶ 7. And, eGuardian incidents that are actually forwarded to the FBI are uploaded into Guardian, which once again, is also included in the CRS. *See id.* ¶ 9–12.

All other information in eGuardian is created by partner law enforcement agencies and is not used by the FBI. Such information exists because eGuardian was created "to meet the challenges of collecting and sharing terrorism-related activities amongst law enforcement agencies across federal, state, local, and tribal jurisdictions," not for the FBI's exclusive or even primary use. *Id.* ¶ 7. This remaining bucket of information, which the FBI does not create or use, is therefore not an agency record, so FOIA does not obligate the FBI to search for it. FOIA obligates an agency to search for only "agency records," which means that the agency "both (1) 'create[s] or obtain[s]' it, and (2) 'controls' it at the time of the FOIA request." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 449 (D.C. Cir. 2013) (citation omitted). Incidents that are submitted to eGuardian by law enforcement agency partners are not created by the FBI. And any eGuardian records submitted by agency partners that the FBI actually uses are uploaded to Guardian, which is in turn uploaded to Sentinel. *See* 2d Seidel Decl. ¶ 9.

Plaintiff nevertheless appears to ask the FBI to search for these non-agency records. This far exceeds the FBI's obligations under FOIA. "In the usual case, this circuit looks to four factors to determine 'whether an agency has sufficient "control" over a document to make it an "agency

7

record.""'" *Judicial Watch*, 726 F.3d at 450 (quoting *Tax Analysts v. DOJ*, 845 F.2d 1060, 1069 (D.C. Cir. 1988)). These include

> "[1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit; [3] the extent to which agency personnel have read or relied upon the document; and [4] the degree to which the document was integrated into the agency's record system or files."

*Id.*

Each of these factors weigh in the FBI's favor. With respect to the first factor, eGuardian is designed to allow the partner agencies to retain or relinquish control over the incidents that they input. Partner agencies have complete discretion to input and remove incidents from eGuardian. 2d Seidel Decl. ¶¶ 8–9. And "partner agencies can restrict the information they contribute in order to deny access to certain groups or individuals." *Id.* ¶ 8. With respect to the second factor, the FBI has the ability to use records only when a fusion center, a "state-owned and operated center[] that serve as focal points in states or urban areas for the receipt, analysis, gathering, and sharing of threat-related information between state, local, tribal, and territorial, federal and private sector partners," *id.* ¶ 7 n.2, approves an incident reported by a partner law enforcement agency. *Id.* ¶ 9. And at that point, the incident is "integrated into the Guardian system and considered an agency record that will be indexed within Sentinel." *Id.* With respect to the third factor, the FBI may read or rely on eGuardian incidents only when the partner agency allows it. In fact, "[w]hen an agency creates (enters) an incident in the eGuardian system, the incident is visible to only the eGuardian system account holders from that agency." *Id.* "The incident cannot be seen . . . by the FBI or any other eGuardian system partner agency." *Id.* With respect to the fourth factor, information in the eGuardian system is integrated into the FBI's record system only when a fusion center approves it. *Id.* And once again, such information is indexed in Sentinel and thus has been searched already. These incident reports are therefore not agency records subject to FOIA.

8

Plaintiff argues nevertheless that there is public evidence that "the eGuardian and Guardian systems contain unique responsive material not included in the CRS or manual incides." Pl.'s Mem. 12–13. Specifically, Plaintiff points to a 2013 Privacy Impact Assessment for the eGuardian System, https://www.fbi.gov/services/information-management/foipa/privacy-impact-assessments/eguardian-threat#ided6d, and a 2008 OIG report on the FBI's Terrorist Threat and Suspicious Incident Tracking System, https://oig.justice.gov/reports/FBI/a0902/final.pdf. But neither of these documents state, as Plaintiff asserts, that eGuardian and Guardian records are not included in the CRS. Indeed, the Privacy Impact Assessment does not even mention the CRS. And footnote one of the OIG Report, which Plaintiff cites in support, states only, "When the FBI completes investigations, the cases are resolved and closed in the ACS system." That once may have been the case,[3] but in addition, once a supervisor approves an incident entry in eGuardian, "Guardian automatically generates an FD-71a complaint form, and the information from the FD-71a is automatically entered in the Sentinel system," 2d Seidel Decl. ¶ 10. And because Sentinel records are indexed for further retrieval in the CRS, *see* 1st Seidel Decl. ¶ 18, all Guardian records are also included in the CRS.

    **C.**    **The FBI's Decision Not to Additionally Search Emails at Field Offices Was Reasonable Because It Would Have Been Redundant.**

Plaintiff's third concern with the FBI's search relates to the FBI's decision not to conduct a separate search of emails in twelve field offices. *See* Pl.'s Mem. 15–18. The FBI has explained, however, that all potentially responsive emails, including those from field offices, are already indexed in the CRS. *See* 2d Seidel Decl. ¶ 14. "FBI personnel are responsible for managing records they create and receive, determining the record status for each, and importing records into an

---

[3] This practice is no longer the case. As the FBI has explained, ACS was decommissioned in 2018. 1st Seidel Decl. ¶ 19. All data was migrated into Sentinel, which became effective across the FBI in 2012. *Id.*

electronic recordkeeping system such as Sentinel." *Id.* ¶ 13. The same is true of the manual indices, even though field offices stopped recording information in manual indices in 1988, likely before emails would have been used, 1st Seidel Decl. ¶ 23. *See* 2d Seidel Decl. ¶ 14. Plaintiff is therefore asking the FBI to conduct a duplicative search.

The D.C. Circuit has held that, under these circumstances, the FBI need not conduct an additional email search. In *Mobley*, the plaintiff requested that the FBI search certain email systems in addition to the CRS. 806 F.3d at 581. In response, the FBI explained that "e-mail systems also are not reasonably likely to result in additional responsive records because the records in them are redundant of records stored in the CRS." *Id.* The court agreed with the FBI and concluded that these "detailed declarations . . . demonstrate that the FBI's search was adequate." *Id.*

Plaintiff nevertheless claims that two produced emails were leads that should have prompted the FBI to conduct an additional email search. *See* Pl.'s Mem. 16–17. But rather than demonstrate that the FBI should conduct another search, these emails confirm that the FBI's CRS search did, in fact, include emails involving field offices. And they are a far cry from the cases that Plaintiff cites, which all involve concrete leads that particular individuals held responsive records. *See Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 407 (D.C. Cir. 2017) (acknowledging that "it will be the rare case indeed in which an agency record contains a lead so apparent that the [agency] cannot in good faith fail to pursue it" but that in that particular case, a produced letter indicated that an unsearched office "was intimately involved in" information related to the request); *Prop. of the People, Inc. v. DOJ*, 405 F. Supp. 3d 99, 122 (D.D.C. 2019) (identifying particular individuals in a field office as likely to hold responsive records).

10

\*\*\*

In sum, Plaintiff's three concerns with the FBI's search amount to nothing. As explained at length in the FBI's two declarations, the FBI conducted a thorough search in all locations responsive records were likely to be found. Plaintiff's attempt to force the FBI to conduct redundant and unnecessary searches should be rejected.

## II. Withholding the Database Printouts Was Proper under Exemptions 6 and 7(C).

Plaintiff raises one final issue, which concerns the FBI's production. Plaintiff claims that the FBI has not demonstrated with sufficient specificity that withholding certain database printouts was proper.[4] Pl.'s Mem. 18–23. In fact, the FBI has provided Plaintiff and the Court with the exact reason why these printouts were withheld: they contain information that would identify third parties, a clear invasion of privacy protected by Exemptions 6 and 7(C).

As Defendants explained in their opening brief, Exemption 6 protects information about individuals in "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Similarly, Exemption 7(C) protects "records or information compiled for law enforcement purposes" to the extent that the disclosure of the records "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Under both of these exemptions, the agency must balance the individual's right to privacy, which is construed broadly, against the public interest in disclosure, which the requester must identify. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976); *Reed v. NLRB*, 927 F.2d 1249, 1251 (D.C. Cir. 1991).

There is no doubt that an agency's declaration must be sufficiently specific to demonstrate an unwarranted invasion of personal privacy. But the FBI's declarations are specific: they explain

---

[4] These database printouts are marked in Exhibit D of the first Seidel Declaration. The specific withholdings that Plaintiff challenges are listed in footnote 7 of Plaintiff's brief.

11

that the withheld printouts contain "dates of birth, social security numbers, residences real property data, professional titles, occupations, educational information, and driver's license numbers" of "third parties of investigative interest." 2d Seidel Decl. ¶¶ 18, 19; *see also* 1st Seidel Decl. ¶¶ 46, 55. Courts routinely permit withholdings that are similarly described. *See, e.g.*, *Performance Coal Co. v. DOL*, 847 F. Supp. 2d 6, 17–18 (D.D.C. 2012) (permitting the withholding of "miners' names, cell phone numbers, and home phone numbers; inspectors' names and e-mail addresses; inspectors' initials; MSHA employees' government issued cell phone numbers, home addresses, and home telephone numbers; third party home addresses, dates of birth, last four digits of social security numbers; and miners' job titles and ethnicities" under Exemption 7(C)); *Dillon*, 102 F. Supp. 3d at 295 (permitting the withholding of "the names and/or identifying information of third party individuals who are of investigative interest to the FBI and/or other law enforcement agencies" under Exemption 7(C)).[5] Plaintiff may want more information about who these individuals are, but as Section Chief Seidel also explained, providing any additional description "risks identifying the actual exempt information protected by the FBI." 2d Seidel Decl. ¶ 19. And the existing information already makes clear that disclosure would be a harmful invasion of privacy.

Plaintiff raises two additional concerns regarding these withholdings, which can be dismissed in turn.

---

[5] Plaintiff incorrectly asserts that the *Dillon* "court never considered [the] plaintiff's challenge to Exemption(C)," Pl.'s Mem. 21. Although the court stated that the plaintiff did not raise a 7(C) challenge with respect to its first request and that "the [c]ourt need not consider the applicability of Exemption (b)(7)(C) to the plaintiff's second FOIA request," *Dillon*, 102 F. Supp. 3d at 296 n.9 (emphasis added), it analyzed 7(C) nevertheless, concluding that "the FBI has demonstrated that the disclosure of each of these categories of information could reasonably be expected to constitute an unwarranted invasion of personal privacy" and "that the FBI properly asserted Exemption (b)(7)(C) with respect to the plaintiff's first FOIA request." *Id.* at 295–96.

*First*, Plaintiff speculates that if there were any segregable portion of the printouts, they should be produced. *See* Pl.'s Mem. 19. This is true in principle, but in this particular instance, the FBI has already provided Plaintiff with "all reasonably segregable, non-exempt information." 2d Seidel Decl. ¶ 20. "The FBI determined any non-exempt information is so intertwined with exempt information that no information could be reasonably segregated for release without triggering foreseeable harm to one or more interests protected by the cited FOIA exemptions." *Id.* And Plaintiff provides no basis to doubt Section Chief Seidel's attestations.

*Second*, Plaintiff argues that the FBI should not withhold the names of individuals who are known to be of investigative interest. *See* Pl.'s Mem. 20–21. The FBI agrees that as a general matter, "when an agency has officially acknowledged otherwise exempt information through prior disclosure, the agency has waived its right to claim an exemption with respect to that information." *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013). But in this particular case, "the FBI did not locate this same information in the public domain." 2d Seidel Decl. ¶ 21. So, there is no legal basis to disclose the withheld identifying information.

Finally, even though it is clear that the FBI is withholding information related to the privacy interests protected by Exemptions 6 and 7(C), that is only part of the analysis. Plaintiff must also demonstrate that disclosure serves a cognizable public interest. *See Carter v. U.S. Dep't of Com.*, 830 F.2d 388, 391–92 & nn.8 & 13 (D.C. Cir. 1987). But Plaintiff makes no attempt to do so. And indeed, the FBI has confirmed that the withheld identifying information would serve no public purpose because it would not "shed any light on the operations and activities of the FBI." 2d Seidel Decl. ¶ 20. On this basis alone, the Court should reject Plaintiff's challenge to these withholdings.

### III. Conclusion

For the foregoing reasons, the Court should grant Defendants' Motion for Summary Judgment and deny Plaintiff's Cross-Motion for Summary Judgment.

Dated: August 12, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ELIZABETH J. SHAPIRO
Deputy Branch Director
Civil Division, Federal Programs Branch

*/s/ Benjamin Takemoto*
BENJAMIN T. TAKEMOTO
(DC Bar # 1045253)
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box No. 883, Ben Franklin Station
Washington, DC 20044
Phone: (202) 532-4252
Fax: (202) 616-8460
E-mail: benjamin.takemoto@usdoj.gov

*Attorneys for Defendants*