## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CATO INSTITUTE,

    Plaintiff,

      v.

FEDERAL BUREAU OF
INVESTIGATION, *et al.*,

    Defendants.

Civil Action No. 20-3338 (JEB)

## MEMORANDUM OPINION

Plaintiff Cato Institute, a non-profit public-policy research organization, brought this Freedom of Information Act suit in relation to a request that it sent to the Federal Bureau of Investigation seeking records about itself.  In its request, Plaintiff included a short list of terms that it wanted the FBI to use in its search, as well as particular databases and locations that it wished to be searched.  In competing Motions for Summary Judgment, the parties now focus on whether the search the FBI conducted — which did not include some of the databases Plaintiff requested — was adequate and whether the Bureau properly withheld certain documents it uncovered.  The Court, satisfied with the more specific supplemental declaration that the FBI recently provided and its own *in camera* review, is persuaded that Defendant conducted an adequate search and properly applied FOIA exemptions to its withholdings.  Judgment in its favor is thus warranted.

## I.       Background

On December 11, 2019, a policy analyst for the Cato Institute submitted a FOIA request to the FBI seeking "any records regarding the Cato Institute."  ECF No. 26-4 (Def. SMF), ¶ 1.

That request asked the FBI to employ specific search terms in its hunt for responsive documents, including "Cato," "Cato Institute," "The Cato Institute," "Cato Benefactor," "Cato employee," and "Cato contractor," as well as a handful of other terms such as "Wikileaks," "Immigration," and "Encryption," among others, to "be utilized[] in a separate search[] in combination with the search terms above." Id.; ECF No. 28-2 (Pl. SMF), ¶ 2. The request also identified specific locations to be included in the FBI's search — notably, FBI field offices and "the FBI Guardian database or any related or successor systems." Def. SMF, ¶ 1.

Notwithstanding the Institute's request that specific FBI databases and locations be searched, the Bureau determined that its Central Records System (CRS) would be the system "where all records responsive to Plaintiff's request would reasonably be found." ECF No. 30-1 (Second Declaration of Michael G. Seidel), ¶ 5 (emphasis added); see also ECF No. 26-1 (Declaration of Michael G. Seidel), ¶ 11 (initially stating that "the CRS is the FBI system of records where responsive records could reasonably be expected to be found") (emphasis added). The CRS database "spans the entire FBI organization and encompasses the records of FBIHQ, FBI field offices, and FBI legal attaché offices ('legats') worldwide." 1st Seidel Decl., ¶ 12. The FBI also manages the Guardian Program, which is a separate system "for reporting, sharing, tracking, and mitigating a large volume of counterterrorism-based incidents." 2d Seidel Decl., ¶ 6. All Guardian records are indexed within the CRS. Id. at 3. Based on leads found in the search of CRS, Defendant also searched the digitized versions of the manual indices of eleven field offices. See 1st Seidel Decl., ¶ 25 & n.7.

The FBI's search of its records returned 166 responsive pages. Id., ¶ 10. Of those, 88 were entirely withheld, while the other 78 were released to Plaintiff in full or in part. See ECF No. 26-2 (Exhibits to Def. MSJ) at 15–17 (Exemption Index). Regarding the vast majority of the

withheld records, the Bureau invoked FOIA Exemptions 6 and 7(C).  Id.; 1st Seidel Decl., ¶ 4.

Although the FBI also withheld a small number of documents under Exemptions 3 and 7(E) and

issued a Glomar response for any potential additional records that would fall under Exemptions 1

and 3 for national-security or foreign-intelligence information, Plaintiff neither challenges those

withholdings nor the Bureau's reliance on Glomar.  See ECF No. 27 (Pl. Cross MSJ) at 1–2;

Exhibits to Def. MSJ at 9–13 (Production Letter).

Cato filed suit on November 17, 2020, and the parties now cross-move for summary

judgment, sparring over the adequacy of the FBI's search and the propriety of some of its

withholdings.  To assist in its analysis, the Court ordered Defendant to produce in camera

redacted and unredacted copies of the disputed materials withheld in whole or in part under

Exemptions 6 or 7(C).  See Minute Order of Oct. 7, 2022.  Having now reviewed those records,

the Court may consider the parties' legal arguments.

## II.    Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986);

Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  A fact is "material" if it can affect the

substantive outcome of the litigation.  See Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at

895.  A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party."  Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S.

372, 380 (2007); Holcomb, 433 F.3d at 895.  "A party asserting that a fact cannot be or is

genuinely disputed must support the assertion" by "citing to particular parts of materials in the

record" or "showing that the materials cited do not establish the absence or presence of a genuine

dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed.
R. Civ. P. 56(c)(1).

When a motion for summary judgment is under consideration, "[t]he evidence of the
nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."
Liberty Lobby, 477 U.S. at 255; see also Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 850
(D.C. Cir. 2006); Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc).  On
a motion for summary judgment, the Court must "eschew making credibility determinations or
weighing the evidence."  Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007).

When both parties move for summary judgment, the court shifts the beneficiary of the
factual inferences.  Once it "determines that one party is not entitled to summary judgment, it
changes tack on the cross motion and gives the unsuccessful movant all of the favorable factual
inferences that it has just given to the movant's opponent."  Clark v. Vilsack, No. 19-394, 2021
WL 2156500, at *2 (D.D.C. May 27, 2021) (internal quotation marks omitted).  It is of course
"possible for a court to deny summary judgment to both sides."  Id.

FOIA cases typically and appropriately are decided on motions for summary judgment.
See Brayton v. Off. of the U.S. Trade Representative, 641 F.3d 521, 527 (D.C. Cir. 2011).  In a
FOIA case, a court may grant summary judgment based solely on information provided in an
agency's affidavits or declarations when they "describe the justifications for nondisclosure with
reasonably specific detail, demonstrate that the information withheld logically falls within the
claimed exemption, and are not controverted by either contrary evidence in the record nor by
evidence of agency bad faith."  Larson v. Dep't of State, 565 F.3d 857, 862 (D.C. Cir. 2009)
(citation omitted).  Such affidavits or declarations "are accorded a presumption of good faith,
which cannot be rebutted by 'purely speculative claims about the existence and discoverability of

other documents.'" SafeCard Servs., Inc. v. Sec. & Exch. Comm'n, 926 F.2d 1197, 1200 (D.C.

Cir. 1991) (quoting Ground Saucer Watch, Inc. v. Cent. Intel. Agency, 692 F.2d 770, 771 (D.C.

Cir. 1981)).  "FOIA expressly places the burden 'on the agency to sustain its action' and directs

the district courts to 'determine the matter de novo.'" U.S. Dep't of Justice v. Reps. Comm. for

Freedom of Press, 489 U.S. 749, 755 (1989) (quoting 5 U.S.C. § 552(a)(4)(B)).

## III.    Analysis

In the course of their briefing, the parties have helpfully narrowed the issues in this

dispute to two: (1) the adequacy of the FBI's search for responsive records, particularly whether

it was obligated to search the Guardian database that Plaintiff identified as a search target in its

initial FOIA request; and (2) the propriety of its withholding of certain records in whole or in

part pursuant to Exemptions 6 and 7(C).  The Court now addresses them in turn.

### A.  Adequacy of FBI Search

An agency "fulfills its [search] obligations . . . if it can demonstrate beyond material

doubt that its search was 'reasonably calculated to uncover all relevant documents.'" Valencia-

Lucena v. U.S. Coast Guard, 180 F.3d 321, 325 (D.C. Cir. 1999) (quoting Truitt v. Dep't of

State, 897 F.2d 540, 542 (D.C. Cir. 1990)).  Thus, "[i]n a FOIA case, a district court is not tasked

with uncovering 'whether there might exist any other documents possibly responsive to the

request,' but instead, asks only whether 'the search for [the requested] documents was

adequate.'" In re Clinton, 970 F.3d 357, 367 (D.C. Cir. 2020) (alteration in original) (quoting

Weisberg v. U.S. Dep't of Just., 745 F.2d 1476, 1485 (D.C. Cir. 1984)).  The adequacy of an

agency's search for documents "is judged by a standard of reasonableness and depends, not

surprisingly, upon the facts of each case." Weisberg, 745 F.2d at 1485.  A FOIA defendant's

affidavits or declarations must "set[ ] forth the search terms and the type of search performed,

and aver[ ] that all files likely to contain responsive materials (if such records exist) were searched." Oglesby v. U.S. Dep't of Army, 920 F.2d 57, 68 (D.C. Cir. 1990).  Unless there is evidence to the contrary, affidavits or declarations meeting these requirements are generally enough to show that an agency complied with FOIA.  See Perry v. Block, 684 F.2d 121, 127 (D.C. Cir. 1982).  "If, however, the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper."  Truitt, 897 F.2d at 542.

The Institute first contends that the FBI did not conduct an adequate search for documents because it never established that the CRS and manual indices were the only locations likely to contain responsive records.  See Pl. Cross MSJ at 4–11.  To satisfy its burden at summary judgment, Defendant must "show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."  Campbell v. U.S. Dep't of Just., 164 F.3d 20, 27 (D.C. Cir. 1998) (quoting Oglesby, 920 F.2d at 68).  To demonstrate the adequacy of its search here, the FBI offers two declarations by Michael G. Seidel, the Section Chief of the Bureau's Record/Information Dissemination Section.  See 2d Seidel Decl., ¶ 1.  In the second of those declarations, Seidel explains that "the CRS is the FBI system where all records responsive to Plaintiff's request would reasonably be found."  Id., ¶ 5.  This is because information about the requesting organization, the Cato Institute, "would reasonably be expected to be in the CRS," which houses "information about individuals, organizations, and other subjects of investigative interest for future retrieval."  Id.  The declaration goes on to explain that, based on the results of the search of CRS, "there is no indication . . . that responsive material would reside in any other FBI system," id.; 1st Seidel Decl., ¶ 33, beyond the manual indices that the FBI also chose to search as a result of leads discovered in this initial search.  See 1st Seidel Decl., ¶ 25.  The D.C.

Circuit, furthermore, has previously held that searches of the CRS system in response to requests for information about particular subjects are reasonable.  See, e.g., Mobley v. Cent. Intel. Agency, 806 F.3d 568, 581–83 (D.C. Cir. 2015).

Not dissuaded from its belief that responsive records exist beyond CRS, Plaintiff in its Reply presses that the Seidel declarations "have still not 'incanted the magic words' that they searched 'all locations likely to contain responsive documents.'"  ECF No. 32 (Pl. Reply) at 2 (quoting Bartko v. U.S. Dep't of Just., 167 F. Supp. 3d 55, 64 (D.D.C. 2016)).  That necessary statement was conspicuously absent from the Bureau's first declaration, which said only that "responsive records could reasonably be expected to be found" in CRS.  See 1st Seidel Decl., ¶ 11 (emphasis added).  The FBI, however, returned with a second that reassures that "all records responsive to Plaintiff's request would reasonably be found" in the CRS database.  See 2d Seidel Decl., ¶ 5 (emphasis added).  Together with the Bureau's earlier statement that "searches of any other locations would be unduly burdensome, duplicative, and unlikely to yield results not found via the CRS index search," 1st Seidel Decl., ¶ 33, the Court is satisfied that any searches beyond CRS would be duplicative and that the FBI has therefore conducted an adequate search using CRS alone.  See Oglesby, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary . . . to determine if the search was adequate in order to grant summary judgment.").

Notwithstanding the FBI's detailed explanation for why the CRS system is the most appropriate location in which to look for the requested files, Plaintiff insists that Defendant should also have searched the Guardian system because the initial FOIA request expressly identified that system as a desired search location.  See Pl. Cross MSJ at 11–15; Pl. Reply at 1–3.

But an express demand that an agency search a specific record system in a FOIA request does not automatically obligate an agency to do so. An agency "generally need not 'search every record system'" in response to a FOIA request, but it must nevertheless continually "revise its assessment of what [constitutes a] 'reasonable' [search] in a particular case to account for leads that emerge during its inquiry." Campbell, 164 F.3d at 28 (quoting Oglesby, 920 F.2d at 68). Still, "a request for an agency to search a particular record system — without more — does not invariably constitute a 'lead' that an agency must pursue." Mobley, 806 F.3d at 582. Rather, "a search is generally adequate where the agency has sufficiently explained its search process and why the specified record systems are not reasonably likely to contain responsive records." Id.

That is precisely what the FBI did here. As detailed by Seidel's declarations, the agency began with the database most likely to contain the information requested, see 2d Seidel Decl., ¶ 5, and then, upon the discovery of leads that pointed to records outside of CRS, searched those as well. See 1st Seidel Decl., ¶ 25 (noting that based on CRS search, FBI then searched manual indices of eleven field offices). The declaration additionally explains that whatever responsive records may be found in Guardian would also have been uploaded to the CRS database and therefore would have been returned in a search of the latter. See 2d Seidel Decl., ¶¶ 11–12; ECF No. 30 (Def. Reply) at 6. So although the "FBI could not decline to search beyond the CRS where records in the CRS themselves indicated that there were undiscovered responsive records located in other record systems," Mobley, 806 F.3d at 582, here the agency has met its burden to follow all leads and clearly explain its decisions about the scope of its final search.

Plaintiff makes some last-ditch arguments about materials that may not have appeared in CRS searches, including unindexed emails. These carry no weight. The FBI has explained that "[t]o the extent e-mail records existed at the time . . . and such email records were federal

records, these records would reasonably be expected to be found" from an index search of CRS, which did in fact uncover leads that resulted in additional searches of the manual indices at specific field offices.  See 2d Seidel Decl., ¶ 14.  The D.C. Circuit has held sufficient such searches for FBI emails in the past, see Mobley, 806 F.3d at 581, and Plaintiff offers no reason that this search of CRS — which did in fact prompt the FBI to conduct additional searches of field-office records — should fare any worse.

Cato also asserts that because Guardian pre-case incident and assessment entries are "only indexed into CRS if a supervisor reviews and approves the entries," certain unapproved entries may not be indexed into CRS and available for search in that system.  See Pl. Reply at 4. As support for this argument, it points to "FBI internal audits [that] have revealed widespread instances of the FBI not complying with its own rules regarding the initiating and handling of assessments," creating the possibility that unapproved Guardian entries may exist outside of CRS.  See id. at 4–5.  There is no evidence of any wrongdoing or agency failure to comply with its recordkeeping rules in this case sufficient to rebut the "presumption of good faith" that this Court must grant the agency in its search for responsive records.  SafeCard Servs., Inc., 926 F.2d at 1200 (noting that "purely speculative claims about the existence and discoverability of other documents" cannot rebut the presumption of good faith) (quoting Ground Saucer Watch, Inc., 692 F.2d at 771).

B.  Exemptions 6 and 7(C)

Next up are the FBI's withholdings under Exemptions 6 and 7(C).  Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  Exemption 7(C) excludes from disclosure "records of information compiled for law enforcement purposes . . . to the extent

that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  Id. § 552(b)(7)(C).  Both provisions require agencies and reviewing courts to "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." Beck v. Dep't of Just., 997 F.2d 1489, 1491 (D.C. Cir. 1993) (quoting Davis v. U.S. Dep't of Just., 968 F.2d 1276, 1281 (D.C. Cir. 1992)).

Although both exemptions require agencies and reviewing courts to undertake the same weighing of interests, the balance tilts more strongly toward nondisclosure in the context of 7(C) because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6."  Reporters Comm., 489 U.S. at 756.  Courts have accordingly held that Exemption 7(C) "establishes a lower bar for withholding material" than Exemption 6.  ACLU v. U.S. Dep't of Just., 655 F.3d 1, 6 (D.C. Cir. 2011); see also Beck, 997 F.2d at 1491.  The former governs here because the documents were indeed compiled for investigative and law-enforcement purposes.  See 5 U.S.C. § 552(b)(7)(C); id. § 552(b)(6).

The dispute over the documents covered under these exemptions has also narrowed over the course of the parties' briefing, and Plaintiff now challenges only Defendant's "withholding of database printouts in their entirety under coded categories (b)(6)-4 and (b)(7)(C)-4."  Pl. Cross MSJ at 19 n.7 (identifying Bates Nos. FBI(20-cv-3338)-82–101, 103, and 105–166 as the documents at issue).  These subcategories correspond to documents that contain the names and identifying information of third parties of investigative interest.  "[T]hird parties who may be mentioned in investigatory files, as well as . . . witnesses and informants who provided information during the course of an investigation," Nation Mag., Wash. Bureau v. U.S. Customs Serv., 71 F.3d 885, 894 (D.C. Cir. 1995), have a substantial privacy interest "in not being

associated with an investigation." Kimberlin v. Dep't of Justice, 139 F.3d 944, 949 (D.C. Cir. 1998). To the extent, then, that individuals can be identified via information contained in the documents at issue, there is little question that "[t]he privacy interest at stake is substantial." SafeCard Servs., Inc., 926 F.2d at 1205. Plaintiff "does not dispute withholding of nonpublic names of third parties of investigative interest." Pl. Cross MSJ at 20. Rather, Cato "challenges the sufficiency of Defendants' proof that the withheld database printouts contain exclusively information that is indeed identifying and pertains to individuals." Id. at 22.

Because the dispute over these withholdings boils down to "exactly what information is being withheld" and whether these documents contain any "segregable information that is non-identifying," Pl. Reply at 6; see Def. Reply at 13 (stating that "the FBI has already provided Plaintiff with 'all reasonably segregable, non-exempt information'"), Cato asked this Court to review in camera the records in question to review the exemption claims. See Pl. Reply at 6. The Court has now done so and can address Plaintiff's challenges.

First, the FBI's declarations note that the Bureau has "determined that these individuals maintain substantial privacy interests in not having their identities disclosed." 2d Seidel Decl., ¶ 23. Defendant maintains that disclosure of the personal information in these database printouts — which includes the "dates of birth, social security numbers, residences[,] real property data, professional titles, occupations, educational information, and driver's license numbers," id., ¶ 19 — "could subject [the individuals] to harassment or embarrassment, as well as undue public attention," and "professional and social repercussions, due to the resulting negative stigma" associated with being of investigative interest to the FBI, "regardless of whether these individuals ever committed a crime." 1st Seidel Decl., ¶ 55.

Plaintiff never counters that disclosure of such records would be in the public interest. This is in part because Cato lacks the identities of the withheld names to make such an argument. See Pl. Cross MSJ at 19.  Regardless, under D.C. Circuit precedent, unless information identifying third parties "is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."  SafeCard Servs., Inc., 926 F.2d at 1206; see also Nation Mag., 71 F.3d at 896 (Where information is not necessary, "to the extent any information contained in 7(C) investigatory files would reveal the identities of individuals who are subjects, witnesses, or informants in law enforcement investigations, those portions of responsive records are categorically exempt from disclosure under Safecard.").  As there is no allegation of such misconduct here, Defendant's withholdings fit well within the ambit of Exemption 7(C) where individuals can be identified.

In addition, the Court's *in camera* review reveals that the identifying information here makes up almost all of the content of the records — and the remainder is inextricably intertwined with such information — confirming that the FBI has indeed "provided Plaintiff with 'all reasonably segregable, non-exempt information.'"  Def. Reply at 13.  "[T]he non-exempt information cannot be reasonably segregated without either compromising the purpose of the FOIA exemptions or offering meaningless words or phrases."  Blixseth v. U.S. Immigr. & Customs Enf't, No. 19-1292, 2020 WL 210732, at *7 (D.D.C. Jan. 14, 2020) (citing Mays v. Drug Enf't Agency, 234 F.3d 1324, 1327 (D.C. Cir. 2000)).  The Government's withholdings are therefore appropriate.

## IV.   Conclusion

For these reasons, the Court will grant Defendant's Motion for Summary Judgment and deny Plaintiff's.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 2, 2022