**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CATO INSTITUTE,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL BUREAU OF INVESTIGATION, *et al*.,<br><br>Defendant. | Case No. 20-cv-3338 (JEB) |

**DECLARATION OF STEPHEN STICH MATCH**

I, Stephen Stich Match, make the following declaration:

1. I am over the age of 18 and competent to provide this declaration.

2. The following statements are made on my personal and professional knowledge and, if sworn as a witness, I can testify competently thereto.

3. I represent Plaintiff Cato Institute in this case.

4. A true and correct copy of the Declaration of Thomas Hardy filed in *Watkins Law & Advocacy, PLLC v. DOJ* is attached as Exhibit 1. Exhibits have been omitted.

5. I was not aware of the Hardy Declaration until I reviewed it several days after the D.C. Circuit August 18, 2023 decision in *Watkins*.

6. On August 30, 2023, I emailed Kevin Kennedy, the FBI's appellate counsel, to ask whether *Watkins* changed the agency's position on appeal.

7. Mr. Kennedy responded on September 14, 2023 that *Watkins* did not change the agency's position on appeal.

8. After Mr. Kennedy's response, Cato filed a notice of supplemental authority with the D.C. Circuit, citing *Watkins*, to which the FBI responded. A true and correct copy of the FBI's response to the notice of supplemental authority is attached as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct. Executed on October 16, 2023.

/s/ *Stephen Stich Match*

Stephen Stich Match

**Exhibit 1**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| WATKINS LAW & ADVOCACY, PLLC<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF VETERANS AFFAIRS, et al.,<br><br>Defendants. | Civ. A. No. 1:17-cv-01974-ABJ |

**DECLARATION OF DAVID M. HARDY**

I, David M. Hardy, declare as follows:

(1) I am the Section Chief of the Record/Information Dissemination Section ("RIDS"), Information Management Division ("IMD"),[1] at the Federal Bureau of Investigation in Winchester, Virginia. I have held this position since August 1, 2002. Prior to joining the Federal Bureau of Investigation ("FBI"), from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act ("FOIA") policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2) In my official capacity as Section Chief of RIDS, I supervise approximately 237 employees who staff a total of twelve (12) Federal Bureau of Investigation Headquarters "FBIHQ") units and two (2) field operational service center units whose collective mission is to

[1] In May 2018, the FBI changed the name of its Records Management Division ("RMD") to IMD.

effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA, as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; the FOIA Improvement Act of 2016; Executive Order 13526; Presidential, Attorney General, and FBI policies and procedures; judicial decisions; and other Presidential and Congressional directives. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to Plaintiff's request for information from its files pursuant to the provisions of the FOIA, 5 U.S.C. § 552. Specifically, I am familiar with the FBI's handling of the Freedom of Information Act ("FOIA") request submitted by Plaintiff for records provided by the Department of Veterans Affairs ("VA") to the FBI concerning Memorandums of Understanding ("MOUs"), the National Instant Criminal Background Check System ("NICS"), and any records memorializing FBI custody or control of such records all communications made by or on behalf of the United States Attorney General to the VA. Additionally, I am familiar with the FBI's handling of a FOIA consultation sent to the FBI by DOJ, Office of Information Policy ("OIP") concerning a DOJ document located by VA during the processing of Plaintiff's request submitted to VA.

(4) The purpose of this declaration is to provide the Court and Plaintiff with an explanation of the FBI's handling of Plaintiff's FOIA request. Additionally, this Declaration is in support of Defendant's Motion for Summary Judgment as the FBI has responded to each part of Plaintiff's FOIA request separately, rendering his complaint moot.

## ADMINISTRATIVE HISTORY OF PLAINTIFF'S FOIA REQUEST

(5) By email dated October 21, 2015, Plaintiff submitted a FOIA request to the FBI seeking:

a. each Memorandum of Understanding entered into between the United States Department of Veterans Affairs ("VA") and the United States Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), concerning or relating to submission by the VA to the DOJ/FBI of information on persons to be prohibited from purchasing a firearm, including but not limited to: the Memorandum of Understanding Between the United States Department of Veterans Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal Background Check System, dated February 27, 2012 (including all amendments, supplements, exhibits, and addenda thereto);

b. all records (including all amendments, supplements, exhibits, and addenda thereto) which set out or reflect the providing of information (such as names of individuals) by the VA to the DOJ/FBI for inclusion in the National Instant Criminal Background Check System ("NICS"), including but not limited to the NICS Index Mental Defective Commitment File, including but not limited to any directive, guidance, policy, instruction, manual, procedure, guideline, standard, internal advice, message, checklist, flow chart, and/or memorandum with respect thereto;

c. to the extent the FBI itself has custody or control of such records, all communications made by or on behalf of the United States Attorney General ("OAG") to the VA requesting or requiring that the VA submit to the DOJ/FBI information on persons to be prohibited from purchasing a firearm, and all communications from the VA in response thereto (on information and belief, OAG made such a request to the VA in 1998) (this request does not seek the subsequent communications that actually provide information concerning particular individuals).

(*See* **Exhibit A**.) The FOIA request specifically stated that "none of the aforementioned requests seek disclosure of the names of individuals provided by the VA to the FBI, nor do they seek any information protected under the Privacy Act."

(6) For administrative convenience, the FBI separated this FOIA request into three

separate cases in its FOIPA Document Processing System ("FDPS")[2] and will address its responses to each part *infra*.

***FOIPA Request Number 1338932-000 (Item "A")***

(7) By letter dated November 17, 2015, the FBI acknowledged receipt of Plaintiff's request[3] and assigned it FOIPA Request Number 1338932-000. The FBI advised that it was searching the indices to the Central Records System for information responsive to his request.[4] **(*See* Exhibit B.)**

(8) By letter dated January 20, 2016, the FBI advised Plaintiff it reviewed 12 pages of responsive material and determined this material originated with, or contained information concerning, other Government Agency(ies) [OGA].[5] The FBI administratively closed the request pending the completion of the consultation. **(*See* Exhibit C.)** This request was then re-opened after the consultation was completed as FOIPA Request Number 1338932-001.

***FOIPA Request Number 1338932-001***

(9) On May 11, 2016, the VA advised the FBI to release the 12 pages of responsive material that the FBI had identified in response to Item A of the request in full to Plaintiff. Therefore, the FBI reopened this part of Plaintiff's FOIA request and assigned it FOIPA Request Number 1338932-001.

---

[2] FDPS is the internal repository and application utilized by RIDS to process, track, and respond to FOIA and or Privacy Act ("FOIPA") requests received by FBI. It stores FOIPA related records.

[3] *See* ¶ 5a, *supra*, herein referred to as "item A."

[4] The FBI understood Plaintiff's request as seeking only the Memoranda of Understanding (MOU) described in ¶ 5a, *supra*. Plaintiff's request did not seek, for example, ancillary documents related to the creation of the MOU.

[5] The FBI consulted with the VA for this part of the request.

(10) By letter dated June 23, 2016, the FBI advised that its consultation was complete and released 12 pages of responsive material to Plaintiff in full. (*See* **Exhibit D**.) The 12 pages consisted of the February 27, 2012 MOU that was identified in Item A of the FOIA request, and included any amendments, exhibits, or attachments to the MOU. The FBI did not locate any other MOU between the FBI and the VA concerning or relating to submission by the VA to the DOJ/FBI of information on persons to be prohibited from purchasing a firearm.

***FOIPA Request Number 1338949-000 (Item "B")***

(11) By letter dated November 5, 2015, the FBI acknowledged receipt of Plaintiff's request[6] and assigned it FOIPA Request Number 1338949-000.

(12) In light of the express language in the request excluding the names of individuals (and other Privacy Act protected material) from the scope of the request, the FBI understood this part of the request to seek documents regarding the process by which the VA provided names (or other information) to the FBI for inclusion in the National Instant Criminal Background Check System ("NICS"). That process is described in the MOU that the FBI produced in response to Item A of the request. The FBI advised Plaintiff that it located 59 pages of responsive records previously processed under the FOIA, but it was withholding the material in full pursuant to FOIA Exemption (b)(7)(E). (*See* **Exhibit E.**) As discussed in paragraph 41 *infra*, the FBI ultimately determined that these 59 pages were not responsive to the request.

(13) The NICS Index Mental Commitment File[7], which also is referenced in the

---

[6] *See* ¶ 5b, *supra*, herein referred to as "item B."

[7] When a record of a person prohibited from possessing a firearm as a result of mental health issues (i.e., a person who has been involuntarily committed to a mental institution or adjudicated a "mental defective" by a court, board, or other lawful authority) is entered in the NICS Indices, the entry contains only a name, other biographic identifiers (e.g., date of birth), and codes for the submitting entity and prohibited category. For further information, see: https://www.bjs.gov/index.cfm?ty=tp&tid=49#terms

request, is itself a listing of names and biographic identifiers of individuals who are prohibited from possessing a firearm as a result of mental health issues.[8] Accordingly, the FBI determined that file to be outside the scope of Plaintiff's request because the request specifically stated that it was not seeking the production of names of individuals provided by the VA to the FBI or other Privacy Act protected information. Ultimately, the FBI found no records responsive to item B, beyond the MOU itself that was released in response to item A of the request. The process by which the VA provides names (or other information) to the FBI for inclusion in NICS is described in the MOU that the FBI produced in response to the first part (item A) of the request. As set forth in the MOU, at the time of the MOU, the process was for the VA to provide encrypted compact discs with the data addressed in the MOU not less than on a quarterly basis.[9] Starting in June 2016, after the search cut-off date of November 3, 2015, associated with Plaintiff's FOIA request, the VA began electronically transmitting the information to the FBI for inclusion in NICS as described in the MOU. As discussed in paragraph 39 *infra*, the FBI conducted a search for any cover letters or similar documentation which may have accompanied the encrypted compact discs and was unable to locate any documents. As part of its search for responsive documents further discussed *infra*, RIDS contacted the individual at the FBI's Criminal Justice Information Services ("CJIS") who received the compact discs from the VA pursuant to the MOU and that individual confirmed that there was no official correspondence that the VA provided with the transmittal of the compact discs.

(14) By letter dated November 16, 2015, Plaintiff submitted an appeal to DOJ OIP

[8] 18 USC § 922(g)(4) prohibits the receipt or possession of firearms by an individual who has been "adjudicated as a mental defective" or "committed to a mental institution."

[9] *See* Memorandum of Understanding Between the United States Department of Veterans Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal Background Check System dated February 27, 2012, Sections I and V(B)(6).

contesting the FBI's November 5, 2015, response to his FOIA request number 1338949-000. (*See* **Exhibit F.)**

(15) By letter dated November 18, 2015, OIP acknowledged receipt of Plaintiff's appeal and assigned it appeal number AP-2016-00612. **(*See* Exhibit G.)**

(16) By letter dated March 16, 2016, OIP affirmed the FBI's response stating it properly withheld the requested information in full under FOIA Exemption (b)(7)(E). OIP also advised Plaintiff of his right to mediation services through the Office of Government Information Services (OGIS). **(*See* Exhibit H.)**

***FOIPA Request Number 1338965-000 (Item "C")***

(17) By letter dated November 10, 2015, the FBI acknowledged receipt of Plaintiff's request[10] and assigned it FOIPA Request Number 1338965-000. The FBI advised that it was searching the indices to the Central Records System for information responsive to his request. **(*See* Exhibit I.)**

(18) By letter dated November 25, 2015, the FBI advised Plaintiff it conducted a search of the FBI's Central Records System and was unable to locate any main file records responsive to his request. Additionally, the FBI advised Plaintiff if he had additional information to provide, the FBI would conduct an additional search. Finally, the FBI advised Plaintiff of his right to file an appeal with OIP within sixty (60) days from the date of the letter in order to be considered timely. **(*See* Exhibit J.)**

(19) On September 25, 2017, Plaintiff filed his complaint in the instant action. (*See* **Docket Number 1.)**

---

[10] *See* ¶ 5c, *supra*, herein referred to as "item C."

## BACKGROUND ON THE NICS[11]

(20) The NICS is a national system that checks available records on persons who may be disqualified from receiving firearms. Specifically, it is a computerized background check system designed to respond instantly on most background check inquiries, which allows the Federal Firearm Licensees ("FFLs") to receive an almost immediate response for information on either: if a prospective buyer is eligible to buy firearms (e.g. ensuring the customer does not have a criminal record or is not otherwise ineligible to make such a purchase) or if the transfer of a firearm would be in violation of Section 922 (g) or (n) of Title 18, United States Code, or state law. As described in paragraph 13 and fn 9 *supra*, the MOU between the FBI and the VA requested in item A of the FOIA request sets forth a procedure for the VA to provide names and other Privacy Act protected information of individuals who have certain mental health issues to be included in the NICS. In addition to names of individuals, the information provided pursuant to the MOU includes other Privacy Act protected information, such as date of birth, social security number, sex, race, place of birth, height, weight, and category of prohibited or restricted person under 18 U.S.C. § 922.[12]

(21) The NICS Index Mental Commitment File, further described in paragraph 13 *supra,* and which also is referenced in item B of the FOIA request, is a listing of names and biographic identifiers of individuals who are prohibited from possessing a firearm as a result of mental health issues and includes individuals provided by the VA to the FBI under the MOU.

(22) NICS is located at the FBI's CJIS Division in Clarksburg, West Virginia and

---

[11] For further information, see https://www.fbi.gov/services/cjis/nics.
[12] *See* Memorandum of Understanding Between the United States Department of Veterans Affairs and the Federal Bureau of Investigation Regarding the National Instant Criminal Background Check System dated February 27, 2012, Sections V(A)(1-7).

provides full service to FFLs in 30 states, five U.S. territories, and the District of Columbia. Therefore, records related to the NICS are most likely located within CJIS Division.

## BACKGROUND ON THE FBI'S SEARCH FOR RECORDS

### *The FBI'S Central Records System*

(23) The Central Records System ("CRS") is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI in the course of fulfilling its integrated missions and functions as a law enforcement, counterterrorism, and intelligence agency to include performance of administrative and personnel functions. The CRS spans the entire FBI organization and encompasses the records of FBI Headquarters ("FBIHQ"), FBI Field Offices, and FBI Legal Attaché Offices ("Legats") worldwide.

(24) The CRS consists of a numerical sequence of files, called FBI "classifications," which are organized according to designated subject categories. The broad array of CRS file classification categories include types of criminal conduct and investigations conducted by the FBI, as well as categorical subjects pertaining to counterterrorism, intelligence, counterintelligence, personnel, and administrative matters. For identification and retrieval purposes across the FBI, when a case file is opened, it is assigned a Universal Case File Number ("UCFN") consisting of three sequential components: (a) the CRS file classification number, (b) the abbreviation of the FBI Office of Origin ("OO") initiating the file, and (c) the assigned individual case file number for that particular subject matter.[13] Within each case file, pertinent

[13] For example, in a fictitious file number of "11Z-HQ-56789;" the "11Z" component indicates the file classification, "HQ" indicates that FBI Headquarters is the FBI OO of the file, and "56789"is the assigned case specific file number.

documents of interest are "serialized," or assigned a document number in the order which the document is added to the file, typically in chronological order.

***The CRS General Indices and Indexing***

(25) The general indices to the CRS are the index or "key" to locating records within the enormous amount of information contained in the CRS. The CRS is indexed in a manner which meets the FBI's investigative needs and priorities, and allows FBI personnel to reasonably and adequately locate pertinent files in the performance of their law enforcement duties. The general indices are arranged in alphabetical order and comprise an index on a variety of subject matters to include individuals, organizations, events, or other subjects of investigative interest that are indexed for future retrieval. The entries in the general indices fall into two category types:

a. Main entry. This entry pertains to records indexed to the main subject(s) of a file, known as "main file" records. The "main" entry carries the name of an individual, organization, or other subject matter that is the designated subject of the file.

b. Reference entry. This entry, or a "cross-reference," pertains to records that merely mention or reference an individual, organization, or other subject matter that is contained in a "main" file record about a different subject matter.

(26) FBI Special Agents ("SA") and/or designated support personnel may index information in the CRS by individual (persons), by organization (organizational entities, places, and things), and by event (*e.g.,* a terrorist attack or bank robbery). Indexing information in the CRS is based on operational necessity, and the FBI only indexes that information considered relevant and necessary for future retrieval. Accordingly, the FBI does not index every individual name or other subject matter in the general indices.

***Automated Case Support***

Case 1:17-cv-01974-ABJ Document 20-5 Filed 12/10/18 Page 11 of 50


(27) Automated Case Support ("ACS") was an electronic, integrated case management system that became effective for FBIHQ and all FBI Field Offices and Legats on October 1, 1995. As part of the ACS implementation process, over 105 million CRS records were converted from automated systems previously utilized by the FBI into a single, consolidated case management system accessible by all FBI offices. ACS had an operational purpose and design to enable the FBI to locate, retrieve, and maintain information in its files in the performance of its myriad missions and functions.[14]

(28) The Universal Index ("UNI") was the automated index of the CRS and provided all offices of the FBI a centralized, electronic means of indexing pertinent investigative information to FBI files for future retrieval via index searching. Individual names were recorded with applicable identifying information such as date of birth, race, sex, locality, Social Security Number, address, and/or date of an event. Moreover, ACS implementation built upon and incorporated prior automated FBI indices; therefore, a search employing the UNI application of ACS encompassed data that was already indexed into the prior automated systems superseded by ACS. As such, a UNI index search in ACS was capable of locating FBI records well before its 1995 FBI-wide implementation until the system was decommissioned on August 1, 2018, in both paper and electronic format.[15]

---

[14] ACS was and the next generation Sentinel system is relied upon by the FBI daily to fulfill essential functions such as conducting criminal, counterterrorism, and national security investigations; background investigations; citizenship and employment queries, and security screening, to include Presidential protection.

[15] Older CRS records that were not indexed into UNI as a result of the 1995 ACS consolidation remain searchable by manual review of index cards, known as the "manual indices." A search of the manual indices is triggered for requests on individuals if the person was born on or before January 1, 1958; and for requests seeking information about organizations or events on or before January 1, 1973. In this case, Plaintiff's search request was for records between 2008 and 2016; therefore, any responsive records would have been captured through a UNI search.

***ACS and Sentinel***

(29) Sentinel is the FBI's next generation case management system that became effective FBI-wide on July 1, 2012. Sentinel provides a web-based interface to FBI users, and it includes the same automated application that was utilized in ACS. After July 1, 2012, all FBI generated records are created electronically in case files via Sentinel; however, Sentinel did not replace ACS and its relevance as an important FBI search mechanism. Just as pertinent information was indexed into UNI for records generated in ACS before July 1, 2012, when a record is generated in Sentinel, information is indexed for future retrieval. Moreover, there was an index data sharing nexus between the Sentinel and ACS systems whereby information indexed into Sentinel was replicated or "backfilled" into ACS. In sum, the Sentinel case management system built on ACS and shared its operational purpose; Sentinel provides another portal to locate information within the vast CRS for FBI records generated on or after July 1, 2012. The CRC automated indices, available within Sentinel and UNI application of ACS, in most cases represented the most reasonable means for the FBI to locate potentially responsive records to FOIPA requests prior to August 1, 2018.[16] This is because these automated indices offered access to a comprehensive, agency-wide set of indexed data on a wide variety of investigative and administrative subjects. Currently, the FBI's automated indices consist of approximately 120 million searchable records and are updated daily with newly indexed material.

---

[16] On August 1, 2018, the ACS case management system was decommissioned and ACS data was migrated into Sentinel including the ACS indices data and digitized investigative records formerly available in ACS. Moreover, Sentinel retains the index search methodology and function whereby the CRS is queried via Sentinel for pertinent indexed main or reference entries in case files. All CRS index data from the UNI application previously searched via ACS is now searched through the "ACS Search" function within Sentinel.

***FDPS Retrieval***

(30) RIDS conducts a search of FDPS for any FOIA/PA requests received by the FBI via the retrieval function. A retrieval search allows RIDS employees to search FDPS by entering search criteria in search fields to retrieve a hit-list of requests. From the hit-list, one can view all available information about a request, such as requesters' names, subject of request, date received, date closed, etc. A retrieval search of FDPS will locate any records on the same topic that had already been processed and released (*i.e.*, "pre-processed records").

**THE FBI'S SEARCH FOR RECORDS RESPONSIVE TO PLAINTIFF'S REQUEST**

(31) It is the FBI's practice to search the Central Records System ("CRS") to determine if the FBI has records about a particular subject in response to most FOIPA requests. However, in this particular case, Plaintiff requested memorandums, policies, and other communication-related documents not specifically tied to an FBI investigation. Therefore, a search of the CRS is not likely to identify all the responsive records.

(32) RIDS conducted a retrieval search of FDPS for Items A, B, and C. Additionally, RIDS contacted the CJIS Division requesting it to conduct searches for information responsive to Plaintiff's FOIA request. Finally, in an abundance of caution, RIDS conducted an ACS and Sentinel search to ensure it identified all potentially responsive records.

***FDPS Retrieval Search Results for Item A***

(33) RIDS conducted a search of FDPS for the memorandum between the VA and the FBI about the NICS, dated February 27, 2012. RIDS conducted the retrieval search of FDPS by entering "Memorandum of Understanding between FBI and Veterans Administration" in the subject field. This search found no previous FOIA requests responsive to Item A.

***FDPS Retrieval Search Results for Item B***

(34) RIDS conducted a retrieval search of FDPS for policies and procedures concerning the NICS. RIDS conducted the retrieval search of FDPS by entering "National Instant Criminal Background" in the subject field. This search produced one previous FOIA request seeking general policies and procedures related to the NICS. RIDS initially identified 59 pre-processed pages of material related to NICS policies and procedures responsive to Plaintiff's request. RIDS' records library did not contain these records. RIDS contacted the CJIS Division which provided 59 pages of material related to NICS policies and procedures.

(35) RIDS initially determined this 59 pages of material was responsive to item B of Plaintiff's FOIA request, and therefore advised Plaintiff that 59 pages were previously processed and were being withheld in full under FOIA Exemption (b)(7)(E).

***FDPS Retrieval Search Results for Item C***

(36) RIDS conducted a search of FDPS for all communications between the Attorney General and Veterans administration, concerning requirements for prohibiting persons from purchasing firearms. RIDS conducted the retrieval search of FDPS by entering "Communications between the Attorney General and Veterans Administration" in the subject field. This search found no previous FOIA requests with material responsive to Item C.

***CJIS Search for Items A, B, and C***

(37) RIDS contacted CJIS because CJIS is the FBI division most likely to possess responsive records in its internal archives.[17] In response to items A (FOIPA Request Number 1338932-000) and C (FOIPA Request Number 1338965-000), RIDS contacted the CJIS Division and requested a search of CJIS' archives for anything responsive to Plaintiff's request. CJIS located 12 pages of material responsive to item A of Plaintiff's request, but did not locate any

[17] *See* ¶ 22, *supra*.

material responsive to item C.

(38) Following Plaintiff's filing of the instant complaint, RIDS contacted CJIS to verify the results of their original search for items A and C. Specifically, RIDS personnel identified the original author of the MOU ("the Author") and contacted the Author directly. The Author confirmed the 12 pages of records are the only records available in the CJIS archives responsive to Plaintiff's request. The Author also affirmed there is no alternative system or archive where records responsive to items A or C would be stored.

(39) Additionally, RIDS requested CJIS search for records responsive to item B (FOIPA Request Number 1338949-000). CJIS confirmed it did not locate anything responsive to item B. Moreover, CJIS could not identify an alternative archive where records responsive to item B would be stored. RIDS specifically requested that CJIS search for cover letters or similar documentation which may have accompanied the encrypted compact discs provided from the VA to the FBI pursuant to the MOU. CJIS conducted a search and was unable to locate any documents. As part of its search for responsive documents, RIDS contacted the individual at CJIS who received the compact discs from the VA pursuant to the MOU and that individual confirmed that there was no official correspondence that the VA provided with the transmittal of the compact discs. This individual also is not aware of any directive, formal guidance, policy, or checklist governing the compact discs from the VA (other than to the extent reflected in the MOU itself).

***Supplemental ACS and Sentinel Index Search for Items A, B, and C***

(40) Though RIDS deemed the original retrieval searches and subsequent searches as well as the searches conducted by CJIS likely to find all responsive records, following Plaintiff's

filing of the instant complaint, it also conducted a "string"[18] index search of ACS and Sentinel using the following search terms to locate records responsive to items A, B, and C of Plaintiff's request: "Veterans Affairs Gun," "VA Gun," "Veterans Affairs," "VA," "National Instant Criminal Background Check Veterans Affairs," "National Instant Criminal Background Check VA," "NICS Veterans Affairs," and "NICS VA." RIDS did not locate any additional responsive records as a result of this search.

**SUPPLEMENTAL REVIEW OF ITEM B RECORDS**

(41) Following Plaintiff's filing of the instant complaint, RIDS reviewed de novo Plaintiff's request and the 59 pages of material originally deemed responsive to Item B. RIDS determined it incorrectly interpreted this part of Plaintiff's request. RIDS' original interpretation was overly broad. In an abundance of caution, RIDS examined the 59 pages closely to ensure it did not contain any responsive material. RIDS determined all 59 pages are not responsive to Plaintiff's specific request because the material does not "reflect the providing of information (such as names of individuals) by the VA to the DOJ/FBI…[emphasis added]." See ¶ 5b, *supra*. Thus, RIDS confirmed this material is not responsive. Instead the material relates to various internal policies and procedures related generally to the FBI's use of the NICS for its own purposes. The material is intended for use by CJIS personnel utilizing the NICS and includes detailed descriptions of the NICS such as standard operating procedures for CJIS personnel using the system and descriptions of the system's capabilities. The pages discuss processes generally and do not address specifically any process for inclusion into the NICS of information provided

---

[18] A "string search" is a search of all terms where the starting characters match the characters typed into the name field. Such a search will automatically capture variations that include these starting characters. A string search is designed to bring up variations of the search term as long as the starting characters of the indexed term match the starting characters of the search term exactly.

by the VA to the FBI under the MOU produced in response to item A of the request.

(42) In the event the court were to deem the 59 pages responsive to Plaintiff's request, they are exempt from disclosure pursuant to FOIA Exemption (b)(7)(E). FOIA Exemption (b)(7)(E) would be asserted to protect the pages at issue, the release of which would disclose techniques and/or procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law. This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures. In this instance, disclosure of this information would allow individuals to know the capabilities of the NICS as well as the standard operating procedures CJIS personnel use to conduct NICS operations. This knowledge could allow individuals to individuals to adjust their behavior accordingly in an attempt to circumvent the NICS and therefore reduce the system's effectiveness in checking available records on persons who may be disqualified from receiving firearms. Because disclosure of this information could reasonably be expected to impede the FBI's effectiveness and potentially aid in circumvention of the law, the FBI has properly withheld this information pursuant to FOIA Exemption (b)(7)(E) in the event the court deems the information responsive to Plaintiff's request.

**PROCEDURAL HISTORY OF CONSULTATION FROM OIP**

(43) On November 9, 2018, the FBI received a 19-page DOJ document containing FBI equities from OIP for review and consultation. This document, DOJ's guide titled "Guidance to Agencies Regarding Submission of Relevant Federal Records to the NICS" (herein "DOJ's

NICS Guide"), was located by VA during the processing of Plaintiff's request submitted to VA. Upon its review of this document, the FBI applied redactions pursuant to FOIA Exemptions (b)(6), (b)(7)(C), and (b)(7)(E). On November 27, 2018, the FBI returned the document to OIP for release to Plaintiff.

## JUSTIFICATION FOR NON-DISCLOSURE UNDER THE FOIA

### EXEMPTION 7 THRESHOLD

(44) Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate the records or information at issue were compiled for law enforcement purposes. Pursuant to 28 USC §§ 533, 534, and Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM") and 28 CFR § 0.85, the FBI is the primary investigative agency of the federal government with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency, to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security, and further the foreign intelligence objectives of the United States. Under this investigative authority, the FBI operates NICS to ensure those lawfully prohibited from purchasing firearms do not do so, allowing the FBI to assist in preventing crimes of violence involving firearms. The responsive record at issue, DOJ's NICS Guide, was compiled by DOJ as guidance for law enforcement agencies (DOJ agencies) to submit law enforcement information to a law enforcement database (NICS), with the core purpose of assisting in preventing crimes of violence involving firearms. Therefore, this information was clearly created for a law enforcement purpose allowing for the application of Exemption 7.

### EXEMPTIONS 6 AND 7(C) –UNWARRANTED INVASION OF PERSONAL PRIVACY[19]

[19] The practice of the FBI is to assert Exemption (b)(6) in conjunction with Exemption (b)(7)(C).

(45) U.S.C. § 552 (b)(6) exempts from disclosure "personnel and medical files and similar files when the disclosure of such information would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552 (b)(7)(C) exempts from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."

(46) In withholding information pursuant to these two exemptions, the FBI is required to balance the privacy interest of the individual mentioned in this record against any public interest in disclosure. For purposes of this analysis, a public interest exists when information would shed light on the FBI's performance of its mission to protect and defend the United States against terrorists and foreign intelligence threats; to uphold and enforce the criminal laws of the United States; and to provide leadership and criminal justice services to federal, state, municipal, and international agencies and partners. In the instance detailed below, where information was withheld pursuant to Exemptions (b)(6) and (b)(7)(C), the FBI determined the individual's privacy interest outweighed the public interest, if any, in the information.[20]

**<u>(b)(6) and (b)(7)(C)</u>** **<u>Name and/or Identifying Information of FBI Support Personnel</u>**

---

Although the balancing test for Exemption (b)(6) uses a "would constitute a clearly unwarranted invasion of personal privacy" standard and the test for Exemption (b)(7)(C) uses the lower standard of "could reasonably be expected to constitute an unwarranted invasion of personal privacy," the analysis and balancing required by both exemptions is sufficiently similar to warrant a consolidated discussion. The privacy interests are balanced against the public's interest in disclosure under the analysis of both exemptions. As used in this declaration, the term "identifying information" includes, but is not limited to, Social Security numbers, date of birth, telephone numbers, and/or other personal information.

[20] As used in this declaration, the term "identifying information" includes, but is not limited to, Social Security numbers, dates of birth, telephone numbers, and/or other personal information.

(47) Within DOJ's NICS Guide, the FBI protected the name and identifying information of an FBI support employee on page 15. This support employee was assigned to handle tasks related to submission of data to NICS. He or she was, and possibly is, in a position of access to information regarding official law enforcement investigations, and therefore could become a target of harassing inquiries for unauthorized access to investigations and/or FBI investigative data if his/her identity was released. Thus, this individual maintains substantial privacy interest in not having his/her identity disclosed in this context, whether or not he/she is currently employed by the FBI. In contrast, the FBI concluded no public interest would be served by disclosing the identity of this FBI support employee to the general public because his/her identity would not, itself, significantly increase the public's understanding of the FBI's operations and activities. Accordingly, after balancing this employee's substantial privacy interest against the non-existent public interest, the FBI properly protected the name and identifying information of this support employee pursuant to Exemptions (b)(6) and (b)(7)(C).

**EXEMPTION 7(E)-INVESTIGATIVE TECHNIQUES AND PROCEDURES**

(48) 5 U.S.C. § 552 (b)(7)(E) provides for the withholding of:

> law enforcement records which would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law.

(49) This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details about the use of well-known techniques and procedures.

(50) The FBI applied Exemption (b)(7)(E) on pages 17 and 18 of DOJ's NICS Guide

to protect a sensitive internal law enforcement email address utilized by the FBI to pursue its law enforcement mission by receiving information from DOJ component agencies for inclusion in NICS.

**<u>(b)(7)(E):</u>** **<u>FBI Sensitive Law Enforcement Email Address</u>**

(51) Within DOJ's NICS Guide, the FBI protected a sensitive internal FBI email address used to receive NICS related communications pursuant to Exemption (b)(7)(E). The existence of internal email address usage is known, but not this specific email address used by the FBI on a daily basis. With the current emerging news of data breaches and other hacking attempts, it is highly likely the release of this type of information could allow criminals to exploit the FBI's Information Technology ("IT") system. Criminals could use this information to gain unauthorized access to internal law enforcement communications, review and manipulate data, or otherwise interfere with the FBI's internal communications and disrupt official FBI business. Such disruption could greatly reduce the FBI's and its law enforcement partners' abilities to enforce firearms-related laws and impede NICS' law enforcement function. Unauthorized access by individuals would allow them to 1) manipulate or alter data submitted by authorized local, state, or federal agencies to NICS and as a result impede the law enforcement function of NICS, hindering local, state, or other federal law enforcement agencies' ability to enforce firearms-related laws; 2) pose as authorized local, state, or federal agencies and submit inaccurate and/or false information on behalf of these agencies to NICS and as a result impede the law enforcement purpose of NICS; and/or allow them to inundate the internal, NICS-related email inbox with a large volume of communications and as a result overload or slow down NICS' internal communications, jeopardizing its law enforcement purpose. Thus, release of this information would enable criminals to circumvent the law and the FBI properly protected this

information from disclosure pursuant to FOIA exemption (b)(7)(E).

## CONCLUSION

(52) The FBI conducted reasonable searches for responsible records. By letter dated June 23, 2016, the FBI processed and released all material responsive to item A in full to Plaintiff. The FBI inadvertently interpreted item B too broadly and corrected this issue upon reexamination of the material. The FBI determined the material withheld in full is not responsive to Plaintiff's request. Moreover, CJIS, the FBI office most likely to possess responsive records, was unable to locate records responsive to this portion of Plaintiff's request. Lastly, the FBI was also unable to locate responsive material related to the item C and advised Plaintiff of such by letter dated November 25, 2015.

(53) Additionally, the FBI reviewed and applied redactions on a DOJ document as part of a consultation from OIP. The FBI properly asserted Exemptions 6, 7(C), and 7(E) on the document to withhold exempt FBI information. The FBI cannot segregate any of this withheld information further as to do so would constitute an unwarranted and clearly unwarranted invasion of an FBI employee's personal privacy; or would reveal information concerning an FBI investigative technique/procedure risking circumvention of the law.

(54) Finally, Plaintiff's complaint alleges the FBI's improperly withheld 59 pages of material in full. The FBI has now demonstrated that, in fact, this material is not responsive to Plaintiff's request, and that it has fully complied with all other parts of Plaintiff's request. Thus, Plaintiff's complaint is moot.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A-J attached hereto are true and correct copies.

Executed this 10th day of December, 2018.

DAVID M. HARDY
Section Chief
Record/Information Dissemination Section
Information Management Division
Federal Bureau of Investigation
Winchester, Virginia

# Exhibit 2

**U.S. Department of Justice**
Civil Division, Appellate Staff
950 Pennsylvania Ave. NW, Rm. 7212
Washington, DC 20530

Tel: (202) 514-4214

September 22, 2023

VIA CM/ECF

Mr. Mark Langer
Clerk of the Court
U.S. Court of Appeals for the
District of Columbia Circuit
E. Barrett Prettyman U.S. Courthouse
333 Constitution Avenue N.W.
Washington, DC 20001

Re: *Cato Institute v. Federal Bureau of Investigation et al.*, No. 22-5342 (D.C. Cir.)

Dear Mr. Langer:

The government submits this response to plaintiff's Rule 28(j) letter regarding *Watkins Law & Advocacy, PLLC v. DOJ*, No. 21-5108, 2023 WL 5313522 (D.C. Cir. Aug. 18, 2023).

*Watkins* involved a FOIA request for "records concerning the process by which the names of certain veterans and other VA beneficiaries are added to a background check system." 2023 WL 5313522, at *1. This Court concluded that the FBI had demonstrated that its search was "reasonably calculated to uncover all relevant documents." *Id.* at *3 (quotation marks and citations omitted).

Plaintiff does not rely on this Court's holding in *Watkins*—which, as noted, favored the government—but rather on a declaration from that case. This effort illustrates the dangers of placing evidentiary materials before the court of appeals that were not before the district court. *Cf. Bos. Carrier, Inc. v. ICC*, 746 F.2d 1555, 1563 n.5 (D.C. Cir. 1984). The declaration described a search of the Central Records System (CRS) as "unlikely" to "identify responsive documents because

Watkins sought documents not specifically tied to an FBI investigation," *Watkins*, 2023 WL 5313522, at *4, in the context of a narrow request for policy-related records regarding a particular FBI-administered program, *id.* at *2. In those circumstances—not present here—the FBI determined that any responsive records would be likely housed with and most effectively retrieved by personnel responsible for that program. *See id.* at *4.

Even if it were properly before the Court, the declaration would not establish that the CRS is limited to "investigative" files. The declaration itself expressly states otherwise. *See Watkins Law & Advocacy, PLLC v. Department of Veterans Aff.*, No. 17-cv-1974, Dkt. No. 20-5, ¶ 23 (D.D.C. Dec. 10, 2018) (stating that the CRS "is an extensive system of records consisting of applicant, investigative, intelligence, personnel, administrative, and general files compiled and maintained by the FBI"). And the record in this case, which directly addressed the issue, is unequivocal on this point. *See* Gov't Br. 19-22. The district court properly concluded that the records sought here would likely be located within the CRS and retrievable through an index search.

Sincerely,

/s/ *Kevin J. Kennedy*
Kevin J. Kennedy

cc: All parties (via CM/ECF)